349 N.E.2d 744 (1976)
OLD TOWN DEVELOPMENT COMPANY (a Partnership) et al., Appellants,
v.
Robert J. LANGFORD et al., Appellees.
No. 2-973A207.
Court of Appeals of Indiana, Second District.
June 17, 1976.
*748 Howard J. DeTrude, Jr., John T. Lorenz, John N. Thompson, Kightlinger, Young, Gray & DeTrude, Indianapolis, for appellants.
Christopher Kirages, Clarence H. Doninger, Alan H. Goldstein, Dutton, Kappes & Overman, Indianapolis, for appellees.
BUCHANAN, Presiding Judge.

CASE SUMMARY
Defendants-Appellants Old Town Development Company, a partnership, consisting of Sidney D. Eskenazi, Marvin Mitchell, Louis Buddy Yosha and Max Nelson, *749 (generally referred to as Old Town) appeal from adverse judgments amounting to Five Hundred Five Thousand Five Hundred 00/100 Dollars ($505,500.00) in favor of Plaintiff-Appellee Robert J. Langford (individually and as Administrator of his wife's estate), on Langford's Complaints for personal injuries, personal property damage, and wrongful death of his wife and two children in an apartment fire, Old Town claiming an erroneous jury instruction by the trial court on two of Langford's three theories of recovery (implied warranty of habitability by lessor and strict liability in tort of lessor for leasing an apartment with a defective heating system), insufficiency of the evidence, an erroneous instruction as to a lease exculpatory clause, and excessiveness of the verdict in Langford's individual action.
We affirm.

FACTS
The evidence and facts most favorable to Langford and the judgments are:
On December 13, 1970, Langford and his wife (Frances) signed a one-year lease with Old Town for a two-story, three bedroom apartment located at 1234 Old Town, South Drive, (Phase II) in Indianapolis, Indiana. Execution of the lease took place in the presence of Jacob Crist, manager of the Old Town Apartment complex.
On March 17, 1971, approximately three months after Langford's entry into possession and twenty months following the completion of Phase II of the Old Town Apartment complex, a fire broke out in the Langford apartment, devastating all of its contents and resulting in the death of Langford's wife (Frances) and two children (Gregory and Denise). After a vain endeavor to reach his children, Langford sustained severe injuries as he was forced to leap from a second story window which he had broken out with his hand.
Langford filed two complaints in the Superior Court of Marion County on October 20, 1971, one individually and the other as Administrator of the estate of his deceased wife, against Old Town and Joe Ogle, d/b/a Ogle Sheet Metal Company (Ogle). Individually, Langford sought damages for personal injuries, personal property loss, and the wrongful death of his two children, alleging liability upon "any or all" of the following theories: (1) negligence, including negligence based upon res ipsa loquitur; (2) breach of implied warranty of habitability; and (3) strict liability in tort based upon the defective heating system. As Administrator, Langford further sought compensation for the wrongful death of his wife upon facts and theories identical to those in his first action.
On March 20, 1973, trial by a jury commenced. It was stipulated that all three deaths were the result of the fire of March 17, 1971 and that:
"... Defendant Old Town Development Company on March 17, 1971 was the owner of an apartment located at 1234 Old Town, South Drive, and such premises had been leased pursuant to written lease to Robert J. Langford and his family by Defendant Old Town Development Company.
"... Sidney E. Eskenazi, Marvin Mitchell, Louis Buddy Yosha and Max Nelson are the general partners of Old Town Development Company and were on March 17, 1971.
"... Defendant Joe Ogle d/b/a Ogle Sheet Metal Company, by and through his employees, installed the heating system in the apartment located at 1234 Old Town, South Drive, Indianapolis, Indiana."
Langford sought recovery from Old Town as owner-landlord of the devastated apartment, while the liability of Ogle was predicated upon his role as subcontractor-supplier-installer of the alleged defective heating system.
*750 The evidence at trial established that the twelve acre Old Town Apartment complex was located at the northeast corner of State Road 100 and Ditch Road, Indianapolis, Indiana. Old Town originally acquired title to the unimproved three and one-half acre parcel encompassing Phase II of the complex (on which Langford's apartment was located) in 1968 by a deed prepared by Marvin Mitchell, in partial fulfillment of a conditional sales contract with Colony Development Corp. By deed dated the same day, Old Town conveyed title to that tract to Mey, Inc., an Indiana Corporation incorporated by Mitchell and of which Sidney D. Eskenazi, Marvin Mitchell, Louis Buddy Yosha and Max Nelson were the officers and directors.
Mey, Inc. then contracted with Town Construction Corp., another Indiana corporation incorporated by Mitchell and of which Eskenazi, Mitchell, Yosha and Nelson were the officers and directors to construct the apartment complex in accordance with plans and specifications prepared by an architect employed by Old Town. Town Construction Corp.'s charter was subsequently revoked by the Indiana Secretary of State effective June 1, 1970, for failure to file annual reports.
Both corporate entities involved in the development of the complex (Mey, Inc. and Town Construction Corp.) appointed Mitchell their Resident Agent and the Principal Office of each corporation was located at 2220 North Meridian Street, Indianapolis, Indiana, the address of the law firm of Eskenazi, Mitchell & Yosha. Defendant Joe Ogle testified that he dealt at all times directly with Mitchell regarding the Old Town project, having submitted his bid, received an acceptance, and signed the contract for installation of heating systems in forty (40) apartments directly with Marvin Mitchell.
Following the completion of Phase II in July of 1969, a second deed prepared by Mitchell conveyed the tract from Mey, Inc. back to Old Town. The terms of this deed instrument recited that Mey, Inc. held title to the property as "nominee" for the partnership and that there had been no consideration for the transaction. Mitchell's own testimony at the trial confirmed that "no money passed hands" in either transaction.
Three experts testified as to the origin and cause of the fire. Following independent investigations each testified that the area of deepest charring, and thus the point of origin of the fire, was the enclosed area between the ceiling of the first story and the floor of the second story immediately above the furnace. A deteriorated section of flue vent (Metalbestos, Type RV) consisting of a malleable aluminum interliner and an outer steel casing, with air insulation between, was discovered within this enclosed area in close proximity to the wooden joists located between floors. After eliminating such potential causes as electrical malfunctions, chemical agents such as kerosene or gasoline, the careless use of cigarettes, cigars, or other smoking materials, and finally the possibility of arson, the experts were in agreement "that the only thing in the area that was likely to cause the fire would have been from the furnace or the components of the furnace", i.e., the flue vent.
The further testimony of one expert placed this flue vent approximately one-half inch from the adjacent combustible material (i.e., one of the wooden joists) in direct violation of the building code and the manufacturer's own specifications (both requiring at least a one-inch clearance between the flue vent and all combustible matter). Old Town's witnesses, George F. Ewing, a Heating and Air Conditioning Inspector for the Metropolitan Development of Buildings, and William Richard Stats, a Vice President of Polytechnique, Inc., and a licensed chemical engineer specializing in combustion gas equipment, stated that if the flue vent were closer than one inch to the combustible material, it would create a "dangerous situation" due to the heat radiating from *751 the pipe even in the absence of a breach therein. As Stats explained at trial, the reason for the mandatory one-inch clearance is "because of the temperature of the pipe [flue vent], if it's too close to the combustibles, it can cause it to catch fire."
Cecil Wheeler, Chief Heating Investigator of the Metropolitan Development Department of Buildings, testified that normal procedure requires two inspections of all new construction, one prior to the installation of the dry wall and the other following the completion of all work. He explained that the initial or "rough-in" inspection is of great importance in that only then is the pipe and duct work fully visible to the inspecting official.
George F. Ewing, a Heating and Air Conditioning Inspector for the Department, subsequently testified that only one inspection of the Old Town complex was made, which was after all work was completed and the flue vent was only visible to the point where it entered the first floor ceiling above the furnace. Thus, it could be inferred that if the required initial inspection had been made at the "rough-in" stage, it could have been determined that the flue vent was too close to combustible material, i.e., less than one inch as required by the building code and the manufacturer's specifications.
Regarding the maintenance and control of the heating system, Jacob Crist, manager of the Old Town Apartment complex, testified that all repairs and maintenance of furnace and heating systems were normally handled by Old Town and not the tenant. This confirmed Langford's testimony concerning his experience with respect to a two-bedroom apartment he rented from Old Town prior to moving to the apartment involved in this case.
Langford testified as to four categories of damages in his two actions. First, he sustained injuries in leaping from the second floor window to escape the fire, which included five broken ribs, a collapsed lung, and a badly cut hand and burned foot. Following emergency surgery (while conscious and without anesthetic) to insert a tube into his collapsed lung, two subsequent operations were needed for the removal of the tube from his chest and for the removal of glass shards imbedded in his left hand. During his twenty days in the hospital and for a period of three to four months following his release, Langford was subjected to extreme pain and suffering as a result of his chest injuries. Treatment required him to cough and inhale deeply at regular intervals to reinflate his left lung and he was forced to sleep in a sitting position due to the extreme pain in his chest cavity. Dr. Phillips, a psychiatrist who had previously treated Langford for his admitted alcoholism, also testified to Langford's acute depression and nightmares following the fire, leading ultimately to a resumption of his alcoholic intake and a deterioration of his physical condition. There was further evidence that Langford had not yet recovered from the emotional trauma and the mental anguish caused by the fire. The total medical expense incurred by Langford resulting from his personal injuries was One Thousand Three Hundred Eleven 00/100 Dollars ($1,311.00).
Second, the fire consumed all of Langford's personal possessions, including the furniture and furnishings for his three-bedroom apartment, the clothing and personal effects of his entire family, and all papers and books and various other items detailed by Langford at trial.
Next, the fire resulted in the premature death of Langford's two children, Denise and Gregory. Denise was "a very beautiful child and very good child" of eleven, described as an excellent pupil in school, who also greatly aided her parents with work around the house. Gregory, nineteen and possessed of a job, resided with his parents and contributed $20.00 a week to his room and board. The burial expense for the two children totaled Two Thousand Six Hundred Thirty-Six 46/100 Dollars ($2,636.46).
*752 Lastly, the fire caused the death of Langford's 51-year-old wife, Frances. Evidence established that Langford was incapable of employment (his last job having been in 1966), the family depending solely upon Frances for maintenance and support. Frances' gross income from her job as sales manager at Tammy Jewels, Inc. had fluctuated from $19,311.14 in 1968, to $14,201.00 in 1969, to $17,128.51 in 1970; however, Jean Barnes, her employer, testified that Frances would have probably earned about $40,000 the year of her death. Funeral expense totaled One Thousand Three Hundred Seventy 23/100 Dollars ($1,370.23).
Pursuant to instructions upon all three of Langford's possible theories of recovery (hereinafter set forth), on March 28, 1973, the jury returned general verdicts in favor of Langford against Old Town and its named partners in the amounts of Three Hundred Fifty-Four Thousand Dollars ($354,000.00) as an individual and One Hundred Fifty-One Thousand Five Hundred Dollars ($151,500.00) as Administrator.
In each action, the jury returned a verdict for the defendant Ogle.
Old Town appeals.

ISSUES
We deem the issues on appeal to be:
ISSUE ONE  Did the trial court erroneously instruct the jury that Old Town as Lessor impliedly warranted the habitability of the apartment occupied by the Langfords?
ISSUE TWO  Did the trial court commit reversible error by instructing the jury that Old Town as Lessor was subject to strick tort liability for leasing the apartment with a defective heating system?
ISSUE THREE  Was the evidence presented at trial sufficient to sustain the verdicts against Old Town?
ISSUE FOUR  Did the trial court err in instructing the jury that the exculpatory and save harmless provisions in Langford's lease were invalid as a matter of Law?
ISSUE FIVE  Was the verdict for Three Hundred Fifty-Four Thousand 00/100 Dollars ($354,000.00) rendered for Langford in his individual capacity so outrageous as to evidence passion and prejudice, and therefore excessive?
The contentions of the parties will be separately considered with each issue.
ISSUE ONE
Did the trial court erroneously instruct the jury that Old Town as Lessor impliedly warranted the habitability of the apartment occupied by the Langfords?

ADDITIONAL FACTS
Over Old Town's timely objection, the trial court submitted Langford's Instruction 6 for the jury's consideration, which read as follows:
"An implied warranty is raised by the law as an inference from the acts of the parties or the circumstances of the transaction.
"Plaintiff and his wife leased an apartment from defendant Old Town Development Company for use as a single family residence and dwelling. If you find that plaintiff and his family leased such apartment, relying on defendant Old Town Development Company to furnish to them an apartment suitable for such purpose, and that the defendant Old Town Development Company knew that the apartment was to be used for such purpose, then you may find an implied warranty that the apartment was reasonably fit, safe and suitable for use as a single family residence or dwelling.
"Defendant Joe Ogle installed the heating system in the apartment. If you find that plaintiff and his family leased such *753 apartment, relying on defendant Old Town Development Company and defendant Joe Ogle, or either of them, to furnish to plaintiff and his family an apartment with a heating system suitable for the purpose of heating such dwelling, and defendant Old Town Development Company and defendant Joe Ogle, or either of them, knew the system was to be used for such purpose, then you may find an implied warranty that the heating system was reasonably fit, safe and suitable for such use.
"If you find that the apartment was not reasonably fit and proper for the purpose to which it was to be used, then you may find a breach of an implied warranty by defendant Old Town Development Company.
"If you find that the heating system was not reasonably fit and proper for the purpose to which it was to be used, then you may find a breach of an implied warranty by defendant Old Town Development Company or defendant Joe Ogle, or both."

(Instruction 6)

CONTENTIONS OF THE PARTIES
Old Town contends the implied warranty instruction does not correctly state the law because Indiana does not imply a warranty of habitability in the landlord-tenant relationship. A lessor is immune from tort liability for the condition of the premises and is only liable for undisclosed latent defects. And Old Town had no knowledge of any defects or latent dangerous conditions.
Langford's reply is that recent Indiana case law flatly rejects the doctrine of caveat emptor and that the ancient doctrine of caveat lessee is no longer tenable because Indiana has inferentially adopted an implied warranty of habitability or fitness ... with particular reference to Theis v. Heuer (1971), 149 Ind. App. 52, 270 N.E.2d 764, adopted on transfer in 1972, Ind., 280 N.E.2d 300.

DECISION
CONCLUSION  It is our opinion that Instruction 6 imposing an implied warranty of habitability on Old Town as Lessor correctly states the law.

HISTORICAL DEVELOPMENT OF IMPLIED WARRANTY OF HABITABILITY
Hoary precepts of primordial common law governing the landlord-tenant relationship justify Old Town's attack on Instruction 6. Lessor tort immunity and its hand maiden, caveat lessee, have characterized the landlord-tenant relationship for centuries. Since 16th century feudal England a lease has been considered a conveyance of an interest in land,[1] carrying with it the doctrine of caveat emptor.
The lessor impliedly covenanted that he had the legal right to transfer possession and that he would leave the tenant in "quiet enjoyment of the leasehold,"[2] but he did not impliedly warrant as to the habitability or fitness of the premises for any particular use.
As a lessee of real property a 16th century tenant in England was expected to inspect *754 the premises prior to the "sale," and in the absence of express covenants to the contrary, he took possession with whatever defects existed at the time of the lease. Nor did the landlord have an implied responsibility to maintain the leasehold in a reasonable state of repair during the term of the lease.[3] He made a conveyance which ordinarily involved no covenants or warranties, express or implied (except as right to convey and quiet enjoyment), leaving the tenant to the tender mercy of caveat emptor.[4] However, the tenant in that agrarian, feudal society was likely to be an artisan capable of shifting for himself in inspecting the land and relatively simple improvements. The improvements were incidental; it was the land that was sought.
It was in this setting that the principal of total tort immunity for the landlord developed ... as part and parcel of the concept that a lease is primarily a conveyance of real estate. The landlord was not liable to the tenant or third persons for personal injury or personal property damage caused by a defect present at the transfer of possession or by defects arising during the term of the leasehold.[5]
Thus evolved the sanctified doctrine of landlord tort immunity, which wrapped in its ancient common law cocoon was exported to this country as part of our heritage.[6]
From the vantage point of the 20th century the social and economic conditions responsible for treatment of the lease as a conveyance of an interest in land are understandable. For centuries, here and in England, leases were largely of farm land, the tenant paying his rent from the proceeds of tilling the soil. The parties were substantially on an equal bargaining level and the average tenant was capable of inspecting the land for possible defects prior to entering the lease. Often the land contained no physical structures, and if present, they were normally simple in design and of secondary importance to the purpose of the lease. If defects arose during the term of the lease, the tenant was usually possessed of both the skill and the resources to make the necessary repairs.
Thus it was consistent with the nature of the relationship to characterize the lease as a conveyance of land, and the designation often aided the tenant by allowing him to enforce his rights by the real action of ejectment, rather than an action for debt.[7]
During and following the Industrial Revolution, the population migration from rural to urban areas accentuated the importance *755 of the structural improvements on the premises, and a corresponding decrease in the significance of the land itself. Leases often developed into complex transactions. The typical lease began to look more like a contract than a conveyance of real estate, often containing numerous express covenants alien to common law transfers of nonfreehold estates.[8]
Accompanying this migration was an ever-increasing distaste for the continued application of caveat emptor, or caveat lessee, to urban leases of both commercial and residential property. Modern and more complex buildings brought added maintenance costs. At the same time tenants were less able to cope with the machinery and sophisticated systems in dwellings and commercial structures, which they had neither the expertise nor the funds to repair. But caveat lessee did not change, and remained firmly entrenched in both English and American common law protecting the lessor from liability for personal injury or personal property damage arising out of defective conditions on the leased premises.[9]
While the cloak of immunity remained draped over the landlord as social and economic conditions changed, certain judicial exceptions were gradually, and grudgingly, carved-out "when such action could be harmonized with the rules governing the liability of a vendor of real property, or when the characterization of a lease as a conveyance was so contrary to social and economic realities that justice required the creation of an exception to the general rule." Love, Landlord's Liability for Defective Premises: Caveat Lessee, Negligence or Strict Liability?, 1975 Wis.L.Rev. 19, 50 (1975).
These exceptions held the landlord to a "duty to repair" by: (1) an implied warranty of habitability in leases of furnished dwellings for a short term; (2) an implied warranty of fitness for a particular purpose in leases the subject of which was a structure under construction at the time of the lease; and (3) a failure to disclose defects of which the landlord had actual or constructive knowledge. Love, supra, at 31.
Even more important for our purpose, additional exceptions made inroads on caveat lessee and a landlord's tort immunity. Five clearly developed exceptions emerged. A landlord could be held liable in tort for (1) defects in premises leased for admission of the public; (2) a breach of a covenant to repair; (3) negligent repairs; (4) defects in "common areas" under the landlord's control; and more recently (5) defects constituting a violation of a provision of the applicable building or housing code. See Love, supra, at 48-78; Grimes, Caveat Lessee, 2 Valparaiso U.L.Rev. 189, 209-224 (1968).
It was not until the 1960's that the courts began to reexamine the package of rights and duties governing the landlord-tenant relationship.[10] In fact the malady affecting lessees could be described as an anachronistic syndrome consisting of tort immunity of the landlord, caveat lessee, the status of the lease as a conveyance and the concept of independent covenants.
Reevaluation of the lessor-lessee relationship was inevitable for various reasons. Probably the single most important reason was recognition that the lease had been gradually transformed from essentially a conveyance to a contract, i.e., that its essential nature is contractual.[11]
*756 Additional factors prompting reevaluation included widespread enactment of housing codes, shortage of low-cost housing (creating a disparity in bargaining power between landlords and residential tenants), organization of tenant unions, development of legal services for the poor, and the growing similarity between the merchant-consumer and landlord-tenant transactions.[12] The time was ripe to discard caveat lessee.
In 1961 the first assault took place. The Supreme Court of Wisconsin in that year decided Pines v. Perssion, 14 Wis.2d 590, 111 N.W.2d 409 (1961). Recognizing the basic incompatibility between the common law and modern housing and health regulations, the Pines court boldly abolished caveat lessee in faver of an implied warranty of habitability as means of furthering Wisconsin's legislative policy expressed in its safe place statute and building code. Later, however, the Wisconsin court restrictively interpreted Pines to be an expansion of the common law exception in a lease of a furnished dwelling for a short term (Posnanski v. Hood, 46 Wis.2d 172, 174 N.W.2d 528 (1970)).
Dissatisfaction with the landlord's "wall of immunity" appeared in Buckner v. Azulai, 251 Cal. App.2d Supp. 1013, 59 Cal. Rptr. 806 (1967) and Reste Realty Corp. v. Cooper, 53 N.J. 444, 251 A.2d 268 (1969). Both opinions, in dicta, assailed the common law "no repair" rule as incompatible with modern changing times, advocating an implied warranty of habitability or fitness much as did Pines.
In the wake of Buckner and Reste, the Supreme Court of Hawaii surfaced as the first court to totally reject caveat lessee as a viable principle in modern society. Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969). After recognizing the growing contractual nature of the modern lease and the analogy between the sale of goods carrying with it an implied warranty of fitness and merchantability and the leasing of real property, the court concluded that "an implied warranty of habitability and fitness for the purposes intended [in the lease of a dwelling house] is a just and necessary implication." Lemle, supra, 462 P.2d at 474.
An even more impressive assault on caveat lessee occurred in 1971 in the oftcited decision of Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970), cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185. In imposing an implied warranty of habitability (including a duty to repair such defects which render the premises "unlivable") on all residential landlords, the Javins court emphasized that the factual assumptions once justifying caveat emptor have no merit in an urban environment. No longer, it said, is the land itself of primary importance. But rather,
"... in the case of the modern apartment dweller, the value of the lease is that it gives him a place to live... . When American city dwellers both rich and poor, seek `shelter' today, they seek a well-known package of goods and services  a package which includes not merely walls and ceilings, but also adequate heat, lights, and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance." 428 F.2d at 1074.
The court went on to observe that the modern tenant is no longer the "jack-of-all-trades" typical of a rural society, but is highly mobile, and is usually without the necessary skill, incentive and financial resources to repair the increasingly complex machinery and equipment found in modern housing. Javins, supra, at 1077-79.
*757 The Javins court also drew from the consumer protection analogy developed in Lemle:
"... In a lease contract, a tenant seeks to purchase from his landlord shelter for a specified period of time. The landlord sells housing as a commercial businessman and has much greater opportunity, incentive and capacity to inspect and maintain the condition of his building. Moreover, the tenant must rely upon the skill and bona fides of his landlord at least as much as a car buyer must rely upon the car manufacturer. In dealing with major problems, such as heating, plumbing, electrical or structural defects, the tenant's position corresponds precisely with `the ordinary consumer who cannot be expected to have the knowledge or capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose.'" 428 F.2d at 1078-79 (citations and footnotes omitted).
Since 1971 the Javins rationale has been increasingly scrutinized and followed by other jurisdictions. Both courts and commentators[13] have rejected caveat lessee as incompatible with contemporary social and economic conditions and have adopted warranty of habitability for residential leases. Today at least 20 jurisdictions have expressly or impliedly embraced the implied warranty of habitability. Javins v. First National Realty Corp., supra; Green v. Superior Court of City and County of San Francisco, 10 Cal.3d 616, 111 Cal. Rptr. 704, 517 P.2d 1168 (1974); Hall v. Municipal Court, 10 Cal.3d 641, 111 Cal. Rptr. 721, 517 P.2d 1185 (1974); Hinson v. Delis, 26 Cal. App.3d 62, 102 Cal. Rptr. 661 (1972); Tonetti v. Penati, 48 A.D.2d 25, 367 N.Y.S.2d 804 (1975); Morbeth Realty Corp. v. Velez, 73 Misc.2d 996, 343 N.Y.S.2d 406 (1973); Amanuensis Ltd. v. Brown, 65 Misc.2d 15, 318 N.Y.S.2d 11 (1971); Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969); Lund v. MacArthur, 51 Haw. 473, 462 P.2d 482 (1969); Boston Housing Authority v. Hemingway, 363 Mass. 184, 293 N.E.2d 831 (1973); King v. Moorehead, 495 S.W.2d 65 (Mo. Ct. App. 1973); Sargent v. Ross, 113 N.H. 388, 308 A.2d 528 (1973); Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971); Timber Ridge Town House v. Dietz, 133 N.J. Super. 577, 338 A.2d 21 (1975); Berzito v. Gambino, 63 N.J. 460, 308 A.2d 17 (1973); Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970); Academy Spires, Inc. v. Brown, 111 N.J. Super. 477, 268 A.2d 556 (1970); Reste Realty Corp v. Cooper, 53 N.J. 444, 251 A.2d 268 (1969); Jack Spring, Inc. v. Little, 50 Ill.2d 351, 280 N.E.2d 208 (1972); Mease v. Fox, Iowa, 200 N.W.2d 791 (1972); Glyco v. Schultz, Ohio Mun.Ct., 62 Ohio Op.2d 227, 289 N.E.2d 919 (1972); Presson v. Mountain States Properties, Inc., 18 Ariz. App. 176, 501 P.2d 17 (1972); Tucker v. Crawford, Del.Super., 315 A.2d 737 (1974); Gable v. Silver, 258 So.2d 11 (Fla.App. 1972); Quesenbury v. Patrick, CCH Poverty L.Rep. ¶ 15,803 (El Paso County Court., Colo. 1972); Givens v. Gray, CCH Poverty L.Rep. ¶ 15,412 (Ga. App. 1972); Commonwealth *758 v. Monumental Properties, Inc., 459 Pa. 450, 329 A.2d 812 (1974); Foisy v. Wyman, 83 Wash.2d 22, 515 P.2d 160 (1973); Steele v. Latimer, 214 Kan. 329, 521 P.2d 304 (1974); Fritz v. Warthen, 298 Minn. 54, 213 N.W.2d 339 (1973).
Typical of the modern trend are two cases. Green v. Superior Court of City and County of San Francisco, supra, and Tonetti v. Penati, supra. In Green the court emphasized the "virtual impossibility" of a tenant making an adequate inspection of modern apartment buildings ... as contrasted to the lessee of yesteryear.
"First, the increasing complexity of modern apartment buildings not only renders them much more difficult and expensive to repair than the living quarters of early days, but also makes adequate inspection of the premises by a prospective tenant a virtual impossibility; complex heating, electrical and plumbing systems are hidden from view, and the landlord, who has had experience with the building, is certainly in a much better position to discover and to cure dilapidation in the premises. Moreover, in a multiple-unit dwelling repair will frequently require access to equipment and areas solely in the control of the landlord.

"Second, unlike the multi-skilled lessee of old, today's city dweller generally has a single, specialized skill unrelated to maintenance work. Furthermore, whereas an agrarian lessee frequently remained on a single plat of land for his entire life, today's urban tenant is more mobile than ever; a tenant's limited tenure in a specific apartment will frequently not justify efforts at extensive repairs." 111 Cal. Rptr. at 709, 517 P.2d at 1173.
The fiction of caveat emptor (lessee) and the nature of a lease as a contractual relationship were emphasized in Tonetti:
"It is evident that the rationale behind the common-law rule, which likened a lease to the sale of a chattel and therefore applied the ancient doctrine of caveat emptor has no rational basis in a modern, urban society. Realistically viewed, and fiction discarded, a lease of residential premises establishes a contractual relationship with mutual obligations and is not intended to be treated as a conveyance of an interest in realty. The main concern of today's tenant is that he acquire premises which he can enjoy for living purposes; ..." 367 N.Y.S.2d at 807.
So by 1971, the trend was underway to characterize a lease as a creature of contract containing an implied warranty of habitability (or fitness) which was mutually dependent upon the tenant's covenant to pay rent and to subject the landlord to a duty to transfer and maintain the leased premises in reasonably good repair throughout the term of the lease. Upon a breach of this duty, the tenant was afforded the full array of contractual remedies, including recision, compensatory damages, specific performance, reformation, and rent abatement.[14]
Such was the state of the law when Judge Sharp's opinion in Theis v. Heuer (1971), 149 Ind. App. 52, 270 N.E.2d 764, was adopted by the Indiana Supreme Court on transfer in 1972, 280 N.E.2d 300.
In Theis, caveat emptor was flatly rejected and a warranty of fitness for habitation was implied in a contract for the sale of a new house by the builder-vendor, despite direct Indiana precedent to the contrary, i.e. Tudor v. Heugel (1961), 132 Ind. App. 579, 178 N.E.2d 442. After stating that "[n]either this court nor our Supreme Court are wedded to a wooden concept of stare decisis which causes adherence to past decisions when the reasons for such decisions no longer exist," the court concluded that time and changing community values demanded Tudor and its underlying *759 doctrine of caveat emptor be overruled as an anachronism in our modern society.
In following the new trend imposing an implied warranty of fitness for habitation in the sale of new homes, the similarity between the vendee of a new residence and an apartment lessee was noted:
"There is a parallel development in the law which is relevant but not necessary for our decision here. It is in the law of landlord-tenant. Modern case law is now finding an implied warranty of habitability by a landlord to his tenant. In Academy Spires Inc. v. Brown, 111 N.J. Super. 477, 268 A.2d 556, 559 (1970), the Supreme Court of New Jersey said: `In a modern society one cannot be expected to live in a multi-storied apartment building without heat, hot water, garbage disposal or elevator service. Failure to supply such things is a breach of the implied covenant of habitability.' See also, Javins v. First National Realty Corp., 138 U.S. App.D.C. 369, 428 F.2d 1071 (1970); Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970); and Inman v. Binghamton Housing Authority, 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895 (1957)." 280 N.E.2d at 305, n. 1.
In 1972 the Supreme Court of Indiana also decided Weaver v. American Oil Co., (1972) 257 Ind. 458, 276 N.E.2d 144. In discussing the burden of a party attempting to enforce a printed form commercial lease containing exculpatory provisions, the court observed:
"The principle should be the same as that applicable to implied warranties, namely, that a package of goods sold to a purchaser is fit for the purposes intended and contains no harmful materials other than that represented. Caveat lessee is no more the current law than caveat emptor. Only in this way can justice be served and the true meaning of freedom of contract preserved." 276 N.E.2d at 147-148. (Our emphasis.)
And more recently, the Supreme Court of Indiana logically extended the implied warranty in Theis v. Heuer to encompass subsequent purchasers of a dwelling house. Barnes v. MacBrown and Co., Inc. (1976), Ind., 342 N.E.2d 619 (handed down February 25, 1976).
The recognition of an implied warranty of habitability as to a residential builder-vendor in Theis, its logical extension in Barnes, and the rejection of caveat emptor by Theis, Weaver and Barnes are at least indications that the seeds of the modern trend abolishing caveat lessee and treating a lease as a contractual relationship have been sown in Indiana.[15]

BASIS FOR LANDLORD'S LIABILITY
If it be assumed that caveat lessee is no longer an acceptable principle of landlord-tenant law in Indiana, and that a lease is no longer a conveyance but rather a contract consisting of mutually dependent covenants including an implied warranty of habitability or fitness, the question of the landlord's immunity from tort liability remains to plague us. The cases exemplifying the modern trend have mostly involved *760 application of contract principles and remedies such as recision, reformation, rent reduction and rent abatement.
Old Town's position is that the general tort immunity enjoyed by landlords for centuries remains a part of Indiana law, and therefore it was error to instruct upon the theory of implied warranty of habitability in this case because Langford sought to recover for both personal injuries and personal property damage ... and our case law supports that position. Anderson Drive-In Theatre v. Kirkpatrick (1953), 123 Ind. App. 388, 110 N.E.2d 506; Hanson v. Cruse (1900), 155 Ind. 176, 57 N.E. 904; Lucas v. Coulter (1885), 104 Ind. 81, 3 N.E. 622; Pointer v. American Oil Co., 295 F. Supp. 573 (N.D.Ind. 1969).
The 1953 case of Anderson Drive-In Theatre v. Kirkpatrick, supra, 110 N.E.2d at 508 summarizes it nicely:
"There is no implied warranty that leased premises are fit for the purposes for which they are let. When an action is based on fraudulent concealment, a duty to disclose the truth must be shown. The rule of caveat emptor applies in the relation of landlord and tenant unless material misrepresentations constituting fraud are specifically alleged, or there is a showing of a fiduciary relationship between the parties."
In the past our cases have not only specifically rejected implied warranty of habitability and embraced caveat lessee, but have consistently applied the general doctrine of immunity from personal injuries or personal property damage, at the same time recognizing the exceptions carved out to the general rule of non-tort liability of the landlord. Consideration has been given to whether the defect was patent or latent, whether the injury was sustained in a "common area," and whether the landlord had expressly covenanted to repair.[16]
Such being the state of Indiana law, it is readily apparent there is a basic inconsistency between adoption of an implied warranty of habitability and retention of the ancient rule of tort immunity and its exceptions. The warranty carries with it *761 a representation that the premises are free of defects rendering them unfit for human habitation ... a representation implied from a lease which is essentially a contract. Landlord tort immunity is based on a lease as a conveyance of land with accompanying caveat emptor (lessee).
If an implied warranty of habitability is to be adopted and landlord tort immunity rejected, it is logical to inquire as to what fills the void. Or, more precisely, what becomes the basis of the landlord's liability for personal injury and personal property damage? Is recovery possible only in contract, only in tort, or may either avenue be pursued? The answer seems to be that either or both approaches may be pursued.

Contract Recovery
The warranty of habitability as developed to date is a covenant implied in residential leases, the breach of which invokes the full range of contract remedies ... damages, rescission, specific performance, reformation, and rent abatement.
Contractual recovery of damages for personal injury and property damage has a history going back to Hadley v. Baxendale (1854), 9 Exch. 341 ... a case long followed in Indiana:
"... [the damage] should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may be reasonably supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it."
See Western Union Tel. Co. v. Biggerstaff (1912), 177 Ind. 168, 97 N.E. 531; Kagy v. Western Union Tel. Co. (1906), 37 Ind. App. 73, 76 N.E. 792; Lowe v. Turpie (1896), 147 Ind. 652, 44 N.E. 25, 47 N.E. 150.
Hadley v. Baxendale has recently been logically extended to specifically encompass personal injury and personal property damage. In Strong v. Commercial Carpet Co., Inc. (1975), Ind. App., 322 N.E.2d 387 (transfer denied, November 25, 1975), the First District of this Court recognized the propriety of seeking recovery in both tort and contract under Indiana Rules of Procedure, Trial Rule 8, and then held the question of plaintiff's interference with Commercial's performance
"... as well as the question of whether the [personal] injury suffered was a natural and proximate result of Commercial's breach which can fairly be said to have been within the contemplation of the parties at the time the contract was entered are questions of fact to be resolved by the jury."[17] 322 N.E.2d at 392 (footnote omitted).
See also United States v. Mt. Vernon Milling Co., Div. of J. RR. Short Mill Co., 345 F.2d 404 (7th Cir.1965).
Reinforcing the concept of recovery of damages for personal injury and personal property damage arising out of breach of contract (implied warranty of habitability) is a specific provision of the Uniform Commercial Code providing recovery for personal injury and personal property damage resulting from a breach of warranty.[18] IC 1971, 26-1-715(2)(b) (Burns Code Ed.).
Cases discussing the implied warranty of habitability in relation to personal injury and personal property recovery are rare  they usually concern themselves with other contract remedies (rescission, reformation, and rent abatement). An exception is Mease v. Fox, supra, in which consequential *762 damages were considered allowable for breach of the contract's implied warranty of habitability:
"In all events, tenants should have the incidental and consequential damages which fall within the general principles governing the allowance of such damages. See id.; cf. § 554.2715, V. Code." 200 N.W.2d at 797.
Other relevant cases granting such recovery include: Hall v. Cohner, 134 Ga. App. 586, 215 S.E.2d 340 (1975); Kipsborough Realty Corp. v. Goldbetter, 81 Misc.2d 1054, 367 N.Y.S.2d 916; Glyco v. Schultz, supra; Kline v. 1500 Massachusetts Avenue Apartment Corp., 141 U.S.App.D.C. 370, 439 F.2d 477 (1970). See also Love, supra, at 104-5, 198-11, 115, n. 533; Note, Landlord-Tenant  The Fall of Tort Immunity, 35 Ohio St.L.J. 212, 219-22 (1974); Note, The Landlord's Emerging Responsibility for Tenant Security, 71 Col.L.Rev. 275, 286-88 (1971); Restatement (2d) of Property-Landlord and Tenant § 5, pp. 44-55 (Statutory Note), § 9.2 (Tent.Draft No. 2, 1974).
The Supreme Court of Indiana recently stated the "contention that a distinction should be drawn between mere `economic loss' and personal injury [as recoverable damages for breach of implied warranty of habitability in the sale of homes] is without merit." Barnes v. MacBrown and Co., Inc., supra, 342 N.E.2d at 621.
So there appears to be a growing recognition that a residential landlord may be held liable for breach of the implied warranty of habitability contained in the lease (a contract) resulting in personal injury or personal property damage to the tenant. The consequential damages envisioned by Hadley v. Baxendale logically come to fruition in breach of an implied warranty of habitability.

Tort Recovery
The other basis for landlord liability for personal injury and personal property damage is in tort. If he is no longer immune from tort liability  thereby joining other classes of defendants who in recent years have been shorn of their immunity (e.g., government entities and charitable organizations), is he strictly liable or liable only in the event of his negligence?
Cases discussing the respective roles of the residential lessor and lessee point to the superior position of the landlord to inspect and maintain complicated modern machinery and equipment, concededly largely under his control.[19] It is he who "sells" a package consisting of living space and can distribute the risk of loss by purchasing liability insurance which becomes part of the cost of the package.
Professor Love, who has extensively examined this subject, persuasively concludes that "if a lease is [to be considered] a contract containing an implied warranty of habitability, a landlord should at least be held to a duty of reasonable care regarding the condition of the leased premises." Love, supra, at 21. (Our emphasis.)
Of the few cases carefully examining the relationship between the landlord's contractual and tort liability after adoption of the doctrine of implied warranty of habitability, the most important is Sargent v. Ross, 113 N.H. 388, 308 A.2d 528 (1973);
"To the extent that Kline v. Burns did not do so, we today discard the rule of `caveat lessee' and the doctrine of landlord nonliability in tort to which it gave birth. We thus bring up to date the other half of landlord-tenant law. Henceforth, landlords, as other persons, must exercise reasonable care not to subject others to an unreasonable risk of harm... . A landlord must act as a reasonable person under all of the circumstances including the likelihood of injury to others, the probable seriousness of such injuries, and the burden of reducing *763 or avoiding the risk... ."[20] 308 A.2d at 534. (citations omitted). (Emphasis added.)
In discussing this case, and the effects of adopting an implied warranty of habitability, an article titled Landlord-Tenant  The Fall of Landlord Tort Immunity in the Ohio State Law Journal (35 Ohio St. L.J. 212 (1974)) characterizes negligence "as a logical extension of the implied warranty of habitability."
New Jersey has held a landlord should be subject to a standard of reasonable care. Dwyer v. Skyline Apartments, Inc., 123 N.J. Super. 48, 301 A.2d 463 (1973), cert. granted and affirmed without opinion, 63 N.J. 577, 311 A.2d 1.
"[T]he nexus between duty and liability is proof of negligence. Negligence in this context requires not only proof of the condition which causes the injury but that the condition was known or should have been known by the landlord prior to the occurrence so that he had an opportunity to correct it.
"Since his duty is not to insure the safety of his tenants but only to exercise reasonable care, a landlord is liable for only injurious consequences to a tenant by reason of defects `of which he has knowledge or defects which have existed for so long a time that * * * he had both an opportunity to discover and to remedy.'" 301 A.2d at 465 (citations omitted).
Arizona has also held:
"... a landlord who leases premises for residential occupancy will not be immune from liability under traditional negligence theories if he fails to act as a reasonable man would in holding his tenants safe from injury due to a condition which, in the words of the Cummings decision, is `unreasonably dangerous'... ." Presson v. Mountain States Properties, Inc., 18 Ariz. App. 176, 501 P.2d 17, 19 (1972).
Other cases have indicated sympathy with abolition of the lessor's general tort immunity and substitution of a standard of reasonable care. Francis v. Pic, N.D., 226 N.W.2d 654 (1975); DiMarzo v. S. & P. Realty Corp., 364 Mass. 510, 306 N.E.2d 432 (1974); Steele v. Latimer, 214 Kan. 329, 521 P.2d 304 (1974).
Also there are jurisdictions holding landlords to the tort standard of reasonable care based on statute. See Lowe v. Root, Mont., *764 531 P.2d 674 (1975); Kipsborough Realty Corp. v. Goldbetter, 81 Misc.2d 1054, 367 N.Y.S.2d 916 (1975); 401 Boardwalk Corp. v. Gutzwiller, 82 Misc.2d 84, 368 N.Y.S.2d 122 (1975); Hall v. Cohner, 134 Ga. App. 586, 215 S.E.2d 340 (1975); Anthony v. United States Fidelity & Guaranty Company, La. App., 312 So.2d 689 (1975); Brennan v. Cockrell Investments, Inc., 35 Cal. App.3d 796, 111 Cal. Rptr. 122 (1973); Uccello v. Laudenslayer, 44 Cal. App.3d 504, 118 Cal. Rptr. 741 (1975); Whetzel v. Jess Fisher Management Company, 108 U.S. App.D.C. 385, 282 F.2d 943 (1960); Clarke v. O'Connor, 140 U.S.App.D.C. 300, 435 F.2d 104 (1970). See also Restatement (Second) of Property-Landlord and Tenant, supra, Statutory Note to Chapter Five, pp. 44-55.
So, it is safe to conclude that courts adopting an implied warranty of habitability, which have discussed the question, have also favored holding the landlord to a tort standard of reasonable care as a consistent counterpart to his contractual liability.
Justification for imposition of a negligence standard is discussed in the same Ohio State Law Journal article that analyzes the Sargent decision. Note, supra, 35 Ohio St.L.J. 212 (1974). The Note states a landlord's failure to comply with statutory requirements of habitability may constitute negligence per se and the "warranty to repair [which is incident to the implied warranty of habitability] creates a legal duty to repair, and a breach of this duty should serve as the basis of tort liability." 35 Ohio St.L.J. at 223-4.[21]
We shall reserve discussion of imposition on the landlord of a standard of strict liability in tort to ISSUE TWO.

CONCLUSION
Having examined the ancient and modern contractual and tort liability of the landlord, we must decide if this Court will chant again the centuries old litany of caveat lessee. Or, do we look to the contemporary social and economic scene and adopt an implied warranty of habitability and non-immunity in tort as the most accurate expression of the ultimate reality between today's residential landlord and tenant? Judge-made law created caveat lessee and judge-made law can discard it. The common law is a malleable tool. Five centuries of caveat lessee is enough.
For us to hold otherwise would be to attempt to extrude a great body of historical landlord-tenant law through a keyhole that no longer exists in today's world.
In summary then we have rejected caveat lessee and have found that an apartment (residential) lease is essentially contractual in nature carrying with it mutually dependent covenants including an implied warranty of habitability and the full range of remedies for breach of contract and that the decided cases limit a residential landlord's tort liability to a standard of due care.
Further, an implied warranty of habitability is bifurcated, consisting of two interrelated parts. By renting an apartment a landlord impliedly (1) warrants that the leasehold is then free from any latent defects or conditions rendering the premises uninhabitable for residential purposes; and (2) promises that the premises will remain reasonably fit for residential purposes during the entire term, a promise which necessarily carries with it an implied duty to repair.[22]
*765 Upon a breach of this warranty (which is discussed further in ISSUE THREE, infra), a landlord is liable to his tenant (1) for all damages available under traditional remedies for breach of contract ... including any consequential damages within Hadley v. Baxendale guidelines; and (2) for personal injury and personal property damage in tort under traditional negligence principles. Personal injury and personal property recovery are thus available regardless of which theory a tenant pursues. Contractual liability flows from breach of the warranty itself and tort liability imposes a duty on landlords, like other persons, to use reasonable care not to subject a foreseeable plaintiff to an unreasonable risk of harm.
Thus, the trial court did not err in instructing the jury that Old Town as lessor impliedly warranted the habitability of the apartment occupied by Langford as being reasonably fit and safe for residential use.[23]
ISSUE TWO
Did the trial court commit reversible error by instructing the jury that Old Town as lessor was subject to strict tort liability for leasing the apartment with a defective heating system?

ADDITIONAL FACTS
Once again over Old Town's timely objection, the trial court submitted Langford's Instruction 7 to the jury for consideration, which read as follows:
"It is the law of this state that one who leases an apartment containing a heating system that is in a defective condition unreasonably dangerous to the lessee or his property, or which, because of a defective condition becomes unreasonably dangerous to the lessee or his property, is liable for injuries or damages thereby caused to the lessee or his property, if the lessor is in the business of leasing apartments containing such heating systems, and the apartment and heating system is expected to and does reach the lessee without substantial change in the condition in which it was leased. This law applies even though the lessor exercised all possible care in the leasing of the premises or heating system.

"It is also the law of this state that one who sells or installs a heating system that is in a defective condition unreasonably dangerous, or which becomes unreasonably dangerous because of a defective condition, is liable to the ultimate user or consumer for injuries or damages caused to the ultimate user or consumer or to his property, if the seller or installer is in the business of selling or installing heating systems, and the heating system is expected to and does reach the ultimate user or consumer without substantial change in the condition in which it was leased or installed. This law applied even though the seller or installer exercises all possible care in the sale and installation of the heating equipment, and even though the ultimate user or consumer has not purchased the heating system from the seller or installer or entered into any contractual relationship with him.
"Therefore, if you find that the heating system was in a defective condition unreasonably dangerous to the plaintiff and his family, or if you find that the heating system, because of a defective condition, became unreasonably dangerous to plaintiff and his family, then you may find both defendants, or either of them, liable, for any injuries or damages suffered by the plaintiff which resulted therefrom." (Instruction 7) (Emphasis supplied.)
*766 At Defendant Ogle's request, and without objection, the jury was also instructed:
"If you find from a preponderance of the evidence that the proximate cause of plaintiff's injuries were from any cause, other than a defect in the flue pipe or heating system or the installation of such heating system in question, then your verdict may be for the Defendant, Joe Ogle, d/b/a Ogle Sheet Metal Co." (Instruction 8)

CONTENTIONS OF THE PARTIES
Old Town contends that although accepted in Indiana, strict tort liability via Restatement (Second) of Torts § 402(A) has not and must not be extended to landlord-tenant law.[24] Therefore, the trial court's instruction upon this theory was highly prejudicial to Old Town and must constitute reversible error on appeal.
Langford responds that it was not a matter of "blindly expanding" the doctrine of strict liability in tort to impose upon these defendants the simple requirement that they lease premises which do not have an inherent and existing defective condition rendering the premises unreasonably dangerous to their occupants.

DECISION
CONCLUSION  It is our opinion that while Instruction 7 subjecting Old Town to strict liability in tort[25] for leasing the apartment with a defective heating system was erroneous, the trial court did not commit reversible error by so instructing the jury under these circumstances.

STRICT LIABILITY IN TORT
Having accepted implied warranty of habitability (fortified by Javins, Green, and accompanying cases with an assist from Theis, Weaver, and Barnes) and having further accepted a standard of due care in tort (fortified by Sargent and Dwyer), it can hardly be charged that the landlord is crucified on a tort cross of strict liability, as Old Town suggests.
It is true that warranty as applied to transactions involving the sale of "goods" carries with it strict (although not absolute) liability, i.e., limited defenses are available to the seller. See Gregory v. White Truck & Equipment Co., Inc. (1975), Ind. App., 323 N.E.2d 280; Love, supra, at 153-57; W. Prosser, Law of Torts §§ 95, 97, 102 (4th ed. 1971); IC 1971, 26-1-2 -314, -315, -318, -607(3)(a), -719(3) (Burns Code Ed.).
*767 Jurisdictions adopting an implied warranty of habitability have bottomed the concept in strict liability ... a contractual strict liability derived from the holding out of the premises by the landlord to be fit for human inhabitation and from the strong analogy to the Uniform Commercial Code (UCC) implied warranties of merchantability and fitness for a particular purpose. Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971) put it this way:
"[A]t the inception of the rental [the landlord warrants] there are no latent [or patent] defects in facilities vital to the use of the premises for residential purposes and that these essential facilities will remain during the entire term in a condition which makes the property livable." 276 A.2d at 252. (Emphasis supplied.)
See also Steele v. Latimer, supra; Boston Housing Authority v. Hemingway, supra; Mease v. Fox, supra; Lemle v. Breeden, supra; Marini v. Ireland, supra; Love, supra.
But while the landlord's contractual liability is conditioned only upon breach of his implied warranty of habitability without independent proof of fault,[26] his tort liability has not been so determined. No cases have been found projecting tort liability that far. And we know of only one case that has directly faced the issue, and it apparently rejected strict tort liability (of the kind found in § 402(A)) for an "ordinary" landlord. See Dwyer v. Skyline Apartments, Inc., supra.[27]
There is similarity in the policies underlying the implied warranty of habitability and the application of the kind of strict liability in tort fashioned by § 402(A),[28] even *768 though implied warranty is a contractual concept enveloped in privity with broader defenses available, and post-injury notice required. See Love, supra, at 145-153; 2 Frumer & Friedman, Products Liability § 16(a)(4)(A), at 3-262.5 et seq.
There is also similarity between a lessor in Old Town's position as a "seller" of a defective product consisting of a package of "goods" and services and the seller of defective goods contemplated by § 402(A) imposing strict liability in tort. However, the analogy is strained. There are dissimilarities, the first one being that there is no sale.[29] The lease is usually for a short term with the lessor retaining title to the residential space and he maintains a continuing relationship with the lessee in accordance with the rights and obligations created by the lease. Secondly, real estate is not generally considered "goods."[30] Thirdly, there is privity between a lessor and lessee, a factor not required by § 402 (A) which is designed to impose liability between a seller of products and a buyer having no contractual relationship.
Theis v. Heuer, supra, applied a warranty of habitability to the sale of a new home ... a transaction arising out of a contractual relationship between the builder-vendor and vendee. In so doing there is no discernible indication by the Indiana Supreme Court that it was imposing strict liability in tort a la § 402(A). Rather the decision seems to nestle snugly against UCC warranties of merchantability and fitness for a particular purpose.
And just as importantly, the Court makes the statement that "... the second paragraph of plaintiff's complaint is sufficient to withstand a motion to dismiss in that it relies on a negligence concept." 280 N.E.2d at 306. (Emphasis added.) The combined relevance of this decision to Old Town is twofold ... (1) Indiana has adopted an implied warranty of habitability in the sale of a new home by the builder-vendor; and (2) the implication is that negligence and not strict products liability is the proper tort standard in such cases.[31]
Barnes v. MacBrown and Co., Inc., supra, a 1976 Indiana Supreme Court decision, goes one step beyond Theis and extends the builder-vendor's implied warranty of fitness for inhabitation to "second or subsequent purchasers of the dwelling house when a latent defect later appears."
The decision is cast in terms of the builder-vendor's warranty of habitability. It criticizes the necessity of privity, but stops short of expressly adopting strict liability in tort (§ 402(A)), although reliance is placed on a products liability case.
Thus, it could be said that the wind in Indiana blows in the direction of strict liability in tort for a landlord leasing residential premises on a short term lease. Recognizing that this same landlord is in privity with his lessee, has not made a sale and has often not built the apartment he *769 leases, there remains this gap to be closed before a residential lessor is subject to strict tort liability (§ 402(A)). If this gap be closed by the Indiana Supreme Court or by the Legislature, an instruction such as Instruction 7 would be supportable on this basis. Such an expansion of tort liability finds little or no support in the decided cases and represents a policy decision suitably reserved for policy makers.
So Instruction 7 is erroneous to the extent it imposes a standard of strict liability in tort of the kind imposed by § 402 (A) for latent defects in the heating system rendering the premises unfit for human inhabitation.

NO PREJUDICE TO OLD TOWN
Having concluded that Instruction 7 is erroneous to the extent that it imposes on Old Town as lessor a standard of strict liability in tort, we must next consider if such error was harmless.
An instruction may be erroneous without being so prejudicial as to constitute reversible error. Instructions should be confined to the issues and evidence before the court and should correctly state the law pertinent to such issues and facts, but reversal will not be required if the record shows that the offending instruction was harmless to the appealing party. See Gregory v. White Truck & Equipment Co., Inc., supra, 323 N.E.2d at 290, n. 7; Easley v. Williams (1975), Ind. App., 321 N.E.2d 752; Honey Creek Corp. v. WNC Development Company (1975), Ind. App., 331 N.E.2d 452; Sheridan v. Siuda (1971), 150 Ind. App. 395, 276 N.E.2d 883; Cato Enterprises v. Fine (1971), 149 Ind. App. 163, 271 N.E.2d 146; Christian v. Gates Rubber Co. (1969), 145 Ind. App. 229, 250 N.E.2d 486 (dissenting opinion by Judge Sullivan and cases cited therein); Baker v. Mason (1968), 253 Ind. 348, 242 N.E.2d 513; Drolet, Admtrx. v. Pennsylvania R. Co. (1960), 130 Ind. App. 549, 164 N.E.2d 555; Summers v. Weyer (1967), 141 Ind. App. 176, 226 N.E.2d 904; Wylie v. Myers (1958), 238 Ind. 385, 150 N.E.2d 887; Hayes Freight Lines, Inc. v. Wilson (1948), 226 Ind. 1, 77 N.E.2d 580; Pawlisch v. Atkins (1932), 96 Ind. App. 132, 182 N.E. 636.
Some of the cases refer to a presumption of prejudice, but recognize that the jury may not necessarily have been confused or misled in reaching its decision. See Birdsong v. ITT Continental Baking Co. (1974), Ind. App., 312 N.E.2d 104; Coffey v. Wininger (1973), Ind. App., 296 N.E.2d 154; Rondinelli v. Bowden (1973), Ind. App., 293 N.E.2d 812; Merriman v. Kraft (1969), 253 Ind. 58, 71, 249 N.E.2d 485; Cato Enterprises v. Fine, supra; Christian v. Gates Rubber Co., supra; Paxton v. Ferrell (1969), 144 Ind. App. 124, 244 N.E.2d 439; Ewing v. Timmons (1963), 135 Ind. App. 274, 278, 193 N.E.2d 497; Evansville City Coach Lines, Inc. v. Atherton (1962), 133 Ind. App. 304, 310, 179 N.E.2d 293; Stull v. Davidson (1955), 125 Ind. App. 565, 579, 127 N.E.2d 130.
Running through the Indiana cases on this subject is a central theme ... error in the giving of a jury instruction will be considered harmless if the verdict would not have been different had the jury been properly instructed.
This theme is in keeping with the stated objective of the Indiana Rules of Trial Procedure "to secure the just, speedy, and inexpensive determination of every action." TR. 1. It also comports with the express language in TR. 61 that:
"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order in anything done or omitted by the court or by any of the parties is ground for granting relief under a motion to correct errors or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order or for *770 reversal on appeal, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." (Emphasis added.)
Most of the cases examining for prejudicial error in the giving of an erroneous instruction were decided prior to the effective date of the Trial Rules on January 1, 1970, at a time when it was often possible to determine the basis for a jury's decision by such devices as interrogatories. See Paxton v. Ferrell, supra; Hancock v. York (1967), 141 Ind. App. 212, 227 N.E.2d 187. As TR. 49 has specifically abolished special verdicts and interrogatories, a determination of the basis for the jury's action is more difficult. In fact, any definitive conclusion as to any such basis, particularly in complex cases, may be unattainable.[32]
The spirit of the Trial Rules is to eliminate procedural technicalities, to disregard error unless substantial injustice will result, and to affirm judgments of trial courts and jury verdicts unless "clearly erroneous." See TR. 52(A); AP. 15(N).
Recent cases exploring the effect of an erroneous instruction have not stressed a presumption of prejudice, but instead have asked if the appellant was really prejudiced by the instruction and whether the jury was misled. See Chrysler Corporation v. Alumbaugh (1976) Ind. App., 342 N.E.2d 908; Honey Creek Corp. v. WNC Development Co. (1975), Ind. App., 331 N.E.2d 452; Coffey v. Wininger, supra; Rondinelli v. Bowden, supra; Spears v. Aylor (1974), Ind. App., 319 N.E.2d 639; Wickizer v. Medley (1976), Ind. App., 348 N.E.2d 96 (handed down on June 7, 1976). But see Birdsong v. ITT Continental Baking Co., supra.
In Chrysler Corporation v. Alumbaugh, supra, the court stated:
"... when reviewing the use of an instruction, we must consider whether an appellant has demonstrated harm. ..." 342 N.E.2d at 918 (citations omitted). (Our emphasis.)
Judge Lowdermilk stated the general test in Honey Creek Corp. v. WNC Development Co., supra:
"The general test on appellate review with respect to the impact of errors is whether it appears that a right result was reached. To ignore the errors the court must be affirmatively convinced that the right result was reached, notwithstanding the errors in the record... .
"Where it is apparent that the right result has been reached by the jury, and the giving or refusal of a particular instruction did not mislead the jury or prejudice the rights of the parties, no reversible error exists... ." 331 N.E.2d at 458 (citations omitted).
So, Instruction 7 must be examined in light of the changes wrought by the Trial Rules, the cases requiring an instruction to correctly state the law, a presumption of prejudice if the law is not stated correctly, an exception to that presumption if the verdicts would not have been different had the jury been properly instructed, and an inability to ascertain the exact basis of a jury's verdicts because of TR. 49.
The jury was properly instructed as to breach of implied warranty of habitability (Instruction 6) and was further properly instructed as to negligence and there *771 was evidence to support verdicts based on either instruction. See ISSUE THREE infra.
The ultimate question is, assuming it was error to instruct the jury on strict liability in tort, was Old Town so prejudiced and the jury so misled as to constitute reversible error?
No case in Indiana has been found deciding the precise question of whether it is reversible error to give an erroneous instruction on one theory of the case, even though the verdicts may be based on two other possible bases of liability (breach of implied warranty of habitability and negligence), each of which is supported by evidence. Is the aggrieved party really prejudiced? Has the jury been misled? Without interrogatories or a special verdict none can say with absolute certainty.
These devices no longer being available the question is better resolved in terms of whether the verdicts are clearly erroneous or demonstrate substantial injustice. An examination of the record reveals that the result reached by the jury would not have been different if Instruction 7 had not been given.
There were only three possible defects in the premises upon which the jury could base its verdicts. Each "defect" justifies imposition of liability on Old Town for either breach of implied warranty of habitability or negligence.
First, testimony placed a wooden joist approximately one-half inch from the flue vent in direct violation of both the building code and the manufacturer's own specifications. And Old Town's witnesses testified that such construction (combustible material in close proximity to a hot flue vent) would create a "dangerous situation" due to the heat radiating from the flue vent even in the absence of a breach, i.e., a hole or other flaw, in the flue vent itself. The jury could reasonably conclude from this evidence that the "defect" was the faulty design and construction of the apartment requiring installation of the flue vent too close to a combustible wooden joist and that this "dangerous situation" led ultimately to the devastation of Langford's apartment, his personal injuries, and the death of his family. See ISSUE THREE infra.
Secondly, the jury could reasonably conclude from the evidence that some inherent defect or malfunction in the heating system (considering the furnace and flue vent as one complete unit) proximately caused the conflagration without distinguishing the various components in the furnace and flue vent or their installation. Such a "defect" falls within the scope of the implied warranty of habitability and justifies Old Town's liability for renting an apartment "... not reasonably fit and proper for the purpose to which it was to be used... ." See ISSUE THREE infra.
Thirdly, regardless of any "defect" in the design and construction of the apartment or any "defect" in the heating system itself, there was evidence that there was no "rough-in" inspection of the pipe and duct work in Langford's apartment. The jury could reasonably conclude from this evidence that any defective condition in the apartment, i.e., in the proximity of the wooden joist to the flue vent or in the external integrity of the flue vent itself, would have been discovered and the fire prevented had the required inspection been made ... and Ogle merely performed according to the direction of the builder.
In ISSUE THREE, infra, the responsibility of Old Town to make such an inspection is discussed and the conclusion reached that the jury could have reasonably found Old Town failed to make a proper inspection in its capacity as builder-owner-landlord of the apartment complex. Liability for breach of this duty is concededly "fault", not "strict" as per Instruction 7.
*772 So the jury's verdicts are supportable based on the evidence of these three defects constituting breach of implied warranty of habitability or negligence, or both. Old Town has made no showing of harm from Instruction 7 as suggested in Chrysler Corporation v. Alumbaugh, supra. And substantial justice is not done under these circumstances by up-ending the verdicts. To do so would be unduly technical and contrary to the express purpose of the Trial Rules.
Having decided that the giving of Instruction 7 was harmless error because the verdicts would not have been different had the offending instruction not been given, there remains Old Town's insistence that the jury's verdicts were inconsistent in relieving Ogle of liability and imposing liability on Old Town ... and that it was prejudiced thereby.
Ogle was the installer of the heating system ... including the furnace, the flue vent and other pipe and duct work in the apartment ... but the jury could reasonably find, and apparently did, that Ogle's involvement with the apartment complex was limited. Ogle had no part in the design or construction of the apartments nor responsibility for inspection at the "rough-in" stage.
Furthermore, the jury could reasonably find that unlike Old Town, Ogle was not in privity with Langford as he was not a party to the lease agreement nor did Langford rely on Ogle in any respect.[33] The jury could reasonably conclude: (1) Langford rented the apartment relying solely on Old Town to furnish an apartment suitable for inhabitation; (2) the apartment was in fact "... not reasonably fit and proper for the purpose to which it was to be used ..."; and (3) Old Town was thus liable for breach of the implied warranty of habitability. See Instruction 6 in ISSUE ONE supra.
Resolving all reasonable doubts in favor of the consistency of the jury's verdicts, the jury was justified in using any of the three defects enumerated above to impose liability on Old Town under the implied warranty instruction or the negligence instruction, and at the same time consistently relieve Ogle of liability. See Indianapolis Newspapers, Inc. v. Fields (1970), 254 Ind. 219, 259 N.E.2d 651, cert. den., 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190.[34]
So much for prejudice and consistency.

*773 ISSUE THREE
Was the evidence presented at trial sufficient to sustain the verdicts against Old Town?[35]

CONTENTIONS OF THE PARTIES

Implied Warranty of Habitability
Old Town maintains that even if an implied warranty of habitability obtains, no evidence was presented to show the apartment "uninhabitable" at the time it was leased. Old Town also asserts, as in ISSUE ONE, that liability under an implied warranty or covenant to repair does not exist for latent defects not known nor reasonably discoverable by the lessor. Lastly, Old Town argues that imposing liability upon these facts effectively makes the landlord an insurer of the safety of his tenants.
Langford replies that there was clearly sufficient evidence to support the jury's finding that the apartment was not reasonably fit and proper for the purpose to which it was to be used, thus amounting to a breach of Old Town's implied warranty of habitability. Furthermore, the jury could reasonably conclude that this breach proximately resulted in the fire which devastated Langford's apartment and caused the death of his family.

Negligence
Old Town argues Langford presented no evidence of any specific acts of negligence on its part sufficient to submit the issue to the jury nor has Old Town been shown to have caused the deterioration in the flue vent. There was no evidence of either actual or constructive knowledge on its part sufficient to impose an active duty to repair the latent condition.
As to res ipsa loquitur, Old Town argues that the apartment (including the furnace and flue system) was under the exclusive control of Langford at all times following execution of the lease; and that the cause of the fire was a hole in the flue vent which was not shown to be such as would normally not result except for the negligence of the persons in control thereof.
In response, Langford argues the reverse  that sufficient evidence was presented at trial both to submit the issues of negligence and negligence via res ipsa loquitur to the jury and to sustain verdicts thereon.

DECISION

Introduction  Standard of Review
Initially, we emphasize that in determining sufficiency of the evidence we are governed by certain timeworn but honored principles of appellate review. The first hardly requires citation. i.e., a reviewing court will neither weigh the evidence nor resolve questions of credibility of witnesses, but will only view that evidence most favorable to the appellee including all reasonable inferences flowing therefrom, to determine if there existed evidence of probative value to establish each material element of the claim.
The second is when a jury has been instructed on two or more possible theories of recovery, the reviewing court will sustain the judgment(s) on any theory supported by the evidence.
As recently as February of last year in Montgomery Ward & Co., Inc. v. Tackett (1975), Ind. App., 323 N.E.2d 242, Judge Lybrook reemphasized this rule:
"It is the duty of this court to sustain the decision of the trial court on any *774 theory supported by the evidence. In re Estate of Barnett, supra [Ind. App., 307 N.E.2d 490]; Lindenborg v. M and L Builders and Brokers Inc. (1973), Ind. App., 302 N.E.2d 816. Tacketts' counterclaim was in two paragraphs. The first claimed compensatory and exemplary damages for alleged wrongful termination of the franchise agreement. The second alleged that Tacketts had been induced to enter into the franchise agreement through various fraudulent misrepresentations by agents of Montgomery Ward, and claimed compensatory damages. The jury returned a general verdict awarding compensatory damages on the counterclaim. In resolving the question of the sufficiency of the evidence to sustain the verdict, we need only determine that the verdict is supported by sufficient evidence upon either of the two paragraphs. Ohio Finance Co. v. Berry (1941), 219 Ind. 94, 37 N.E.2d 2; Clarke Auto Co. v. Reynolds (1949), 119 Ind. App. 586, 88 N.E.2d 775." 323 N.E.2d at 247. (Emphasis added.)
See also Gerlot v. Swartz (1937), 212 Ind. 292, 300, 7 N.E.2d 960; Sheraton Corp. of American v. Kingsford Packing Co., Inc. (1974), Ind. App., 319 N.E.2d 852; Hunter v. Milhous (1973), Ind. App., 305 N.E.2d 448; Saloom v. Holder (1973), Ind. App., 304 N.E.2d 217.
So, if the evidence most favorable to Langford supports the general verdicts in his favor upon any or all of his various theories of recovery, the verdicts will not be overturned. In ISSUE TWO Langford's theory of strict liability in tort was rejected, leaving for consideration two theories, breach of implied warranty of habitability and negligence.

Implied Warranty of Habitability
CONCLUSION  It is our opinion that the evidence was sufficient to sustain the jury's verdicts upon Langford's theory of breach of implied warranty of habitability.
In ISSUE ONE we concluded that it was proper to instruct upon Langford's theory of implied warranty of habitability. Our task now is to determine if there was sufficient evidence to justify a finding that "the apartment was not reasonably fit and proper for the purpose for which it was to be used," i.e., that there was a breach of Old Town's implied warranty of habitability. See Instruction 6 in ISSUE ONE, supra.
More explicitly our previous conclusion was that the implied warranty of habitability burdens the landlord with two obligations ... a warranty of fitness and a duty to repair. By renting an apartment for residential use the landlord impliedly (1) warrants that the leasehold is then free from any latent defects or conditions rendering the premises uninhabitable for residential purposes; and (2) promises that the premises will remain reasonably fit for residential purposes during the entire term, a promise which necessarily carries with it an implied duty to repair. Liability is based upon a breach of the warranty of habitability at which time the tenant may recover (1) for all damages available under traditional remedies for breach of contract ... including any consequential damages within Hadley v. Baxendale guidelines; and (2) for personal injury and personal property damage in tort under traditional negligence principles.
Permeating discussions of what constitutes a breach of the implied warranty of habitability is the requirement of notice. Generally the cases state the landlord must receive notice of the allegedly defective condition and a reasonable time to correct it before the tenant can assert a breach of the warranty of habitability. See the individual cases following the Javins rationale discussed in ISSUE ONE, supra. See also Bell v. Bernard Motors, Inc. (1975), Or., 537 P.2d 86; McWilliam v. Phillips Petroleum, Inc. (1974), 269 Or. 526, 525 P.2d 1011; Robitaille v. Brousseau (1975), R.I., 339 A.2d 738; Kipsborough *775 Realty Corp. v. Goldbetter, supra; Note, supra, 35 Ohio St.L.J. at 227.
As Professor Love explains, this notice requirement reflects a continued unwillingness on the part of courts to subject a landlord to strict liability. Love, supra, at 105.
However, as indicated in ISSUE TWO, the jury in this case faced three possible answers to the "defective condition" which proximately caused the apartment fire. Regardless of which the jury chose, they all were concededly latent defects, i.e., hidden conditions in the premises at the inception of the lease which later surfaced and rendered the apartment unfit for human inhabitation.[36] As such, they are within the warranty of fitness branch of the implied warranty of habitability and the notice requirement is minimal. See Mease v. Fox, supra; Boston Housing Authority v. Hemingway, supra, 293 N.E.2d at 844, n. 18; McKenna v. Begin, Mass. App., 325 N.E.2d 587 (1975); Restatement (Second) of Property  Landlord and Tenant § 5.1, Comments (Tent. Draft No. 1, 1973). Constructive notice of latent defects is presumed by some jurisdictions from the landlord's prior possession of the premises and from his implied warranty, i.e., his implied "affirmation of fact," that the premises are free from any such defects.
In addition, Old Town's unique status as the builder-owner-landlord of the apartment complex creates a presumption of knowledge:
"If the landlord constructed the premises or supervised their construction, he should be presumed to have knowledge of any latent defects in the original construction of the building." Love, supra, at 125 (footnote and citations omitted). (Emphasis supplied.)
See also Dwyer v. Skyline Apartments, Inc. supra, 301 A.2d at 465.
So lack of actual notice of latent defects in the apartment at inception of the lease to Langford as such does not stand in the way of commission of breach of the warranty by Old Town.
Presuming the landlord has notice of existing latent defects at the inception of the lease (regardless of whether they must be ascertainable by a reasonable inspection) carries strong overtones of strict liability. A blurry line separates constructive notice and the imputed notice characteristic of the UCC warranties of merchantability and fitness for a particular purpose (see IC 1971, XX-X-X-XXX, -315 (Burns Code Ed.)) and strict products liability in terms of Restatement (Second) of Torts § 402(A). We find no implied warranty of habitability cases discussing this point  only those applying a contact theory (with its concomitant notice requirement) or a negligence standard in tort, as previously discussed.
*776 Applying strict liability in tort as found in § 402(A) to a residential landlord was rejected for the reasons stated in ISSUE TWO. However, there are two considerations militating in favor of subjecting a landlord to the strict contractual liability of the kind found in the UCC.
First, the analogy between an implied warranty of fitness for inhabitation and the UCC implied warranties of merchantability and fitness for a particular purpose is apparent. Implied warranty of habitability was spawned in contractual waters and gained nourishment from comparisons to the UCC and sales of goods. All jurisdictions adopting an implied warranty of habitability have justified the move, at least in part, by an extended comparison of modern residential leases and the UCC's implied warranties.
Second, Theis and Barnes must play a part in determining whether the implied warranty of fitness for inhabitation adopted by Theis carries with it the same contractual strict liability found in the implied warranties of the UCC. Neither case is explicit in this respect, nor as to any requirement of pre-injury (prior) notice or the need for an opportunity to repair before the warranty of habitability can be breached.
Applying a quasi-UCC strict liability to residential landlords under the banner of an implied warranty of fitness for inhabitation is attractive, partially because it is simple. But the repercussions may not be so attractive. Applied to the lessor of an apartment complex like Old Town who parallels the builder-vendor status in Theis and Barnes and the manufacturer-seller status under the UCC, this kind of quasi-UCC strict contractual liability is relevant. It is hardly relevant to the lessor living in one half of a double who rents the other half.
So, for the purpose of this case and until further word is heard from the Legislature or our Supreme Court, the soundest course is to adhere to the principle established in other jurisdictions requiring prior notice (either actual or constructive) and an opportunity to repair as prerequisites to breach of the implied warranty of habitability. In following such a course, it is recognized that presuming notice (constructive notice) of a latent defect is in itself a form of limited strict liability in contract.
Decision of this case also does not require us to define the exact scope of this constructive notice, i.e., whether it encompasses all defects in the leasehold at its inception or just those discoverable upon a reasonable inspection. See Love, supra, at 104-6; Note, supra, 35 Ohio St.L.J. at 227; and cases adopting the Javins rationale, supra.
As indicated in ISSUE TWO there was evidence justifying the jury in finding that Old Town as a landlord, possessed constructive knowledge of latent defects in Langford's apartment. There was also evidence that Old Town as builder-owner was in a position to have knowledge of defects in Langford's apartment.
The legal basis for casting Old Town in the role of a builder-owner (it having already stipulated to the role of landlord-owner at the lease's inception) is that separate corporate existence will be ignored on equitable grounds in some circumstances.
Indiana, like other jurisdictions, has recognized:
"[T]hat there are cases where, to prevent fraud or injustice, it is necessary to disregard the fiction of distinct corporate existence, and to hold as a matter of equity that such separate legal entity does not exist. Feucht v. Real Silk Hosiery Mills, Inc. (1938), 105 Ind. App. 405, 12 N.E.2d 1019." Hart, Schaffner and Marx v. Campbell (1942), 110 Ind. App. 312, 321, 38 N.E.2d 895, 899.
See also Storm v. Marsischke (1973), Ind. App., 304 N.E.2d 840, 844; Merriman v. *777 Standard Grocery Co., Inc. (1969), 143 Ind. App. 654, 658, 242 N.E.2d 128; Clarke Auto Co. v. Fyffe (1954), 124 Ind. App. 222, 116 N.E.2d 532 (and authorities cited therein); Henn, Law of Corporations § 146, p. 252 (Piercing the Corporate Veil); Note, Alternate Methods of Piercing the Corporate Veil in Contract and Tort Cases, 48 B.U.L.Rev. 123 (1968).
"Piercing the corporate veil" can be traced back to 1809. Bank of United States v. DeVeaux (1809), 9 U.S. (5 Cranch) 61, 3 L.Ed. 38. Unfortunately, use of this metaphor through the years has become inextricably intertwined with other words and phrases more or less descriptive of circumstances in which separate corporate existence is ignored, e.g., "instrumentality," "agency," "alter ego," "identity" and "adjunct."[37]
Various standards have been proposed from time to time to escape the resulting confusion,[38] but we need only be concerned with Indiana law. We note that no general formula such as "alter ego" or "instrumentality" can satisfy all cases. Rather, the only realistic approach is to deal with each case on its own merits. See Ballantine, Corporations § 293 (rev. ed) 1946; Note, A Plea for Separate Statutory Treatment of the Closed Corporation, 33 N.Y.U.L.Rev. 700, 739 (1958); F.J. Powell, Parent and Subsidiary Corporations (1931); Douglas and Shanks, Insulation from Liabilities through Subsidiary Corporations, 39 Yale L.J. 193 (1929); Note, Alternative Methods of Piercing the Corporate Veil in Contract and Tort Cases, 48 B.U.L.Rev. 123 (1968).
In 1938, the Appellate Court applied the instrumentality concept in Feutch v. Real Silk Hosiery Mills, Inc. (1938), 105 Ind. App. 405, 12 N.E.2d 1019:
"It is also recognized in principle that the fiction of corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation." 12 N.E.2d at 1021.
Furthermore,
"It is well established that `* * * the parent corporation will be responsible for the obligations of its subsidiary when * * * the subsidiary has become its mere instrumentality.' Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693, 704 (1938), Rev.'d on other grounds 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (quoting Powell, supra at 8)." Steven v. Roscoe Turner Aeronautical Corporation, 324 F.2d 157, 160 (7th Cir.1963) (applying Indiana law).
See also Allegheny Airlines, Inc. v. United States, 504 F.2d 104, 112 (7th Cir.1974); Cf. Storm v. Marsischke, supra; Merriman v. Standard Grocery Co., Inc., supra; Clarke Auto Co. v. Fyffe, supra.
The instrumentality rule is a triad, liability being predicated upon the presence of:
"... control by the parent to such a degree that the subsidiary has become a mere instrumentality [having no separate mind, will or existence of its own]; fraud or wrong by the parent through its *778 subsidiary, e.g., torts, violation of a statute or stripping the subsidiary of its assets; and unjust loss or injury to the claimant, such as insolvency of the subsidiary." Steven v. Roscoe Turner Aeronautical Corporation, supra, at 160. (Our emphasis.)
To establish the requisite degree of control, courts consider numerous factors.[39] To name a few  ownership of the subsidiary's capital stock, common directors or officers, financial support of the subsidiary's operation by the parent, the subsidiary being without substantial business contacts except for the parent, the subsidiary's acts referred to or treated as those of the parent, use of the subsidiary's property by the parent as its own, directors or executives of the subsidiary not acting independently, and failure of the subsidiary to observe formal legal requirements, such as keeping separate records and filing needed reports.[40]
The instrumentality rule is generally stated in terms of related corporations, but it need not necessarily be so:
"The Rules applicable to parent and subsidiary corporations apply with equal force to cases of a person holding all or most of the capital stock of a corporation. If it is his mere instrumentality, its separate corporate entity will be disregarded and he will be held personally liable." 2 R. Powell, The Law of Real Property p. 225[2][a], at § 11 (rev.ed. 1973).
Also see In re First National Bank, 23 F. Supp. 255 (E.D.Ill. 1938); Dixie Coal Min. and Mfg. v. Williams, 221 Ala. 331, 128 So. 799 (1930); Zaist v. Olson, 154 Conn. 563, 227 A.2d 552 (1967); Note, supra, 48 B.U.L.Rev. at 129, 136.
We are aware of no reason why a partnership manipulating corporations for its own purposes should be any less subject to the instrumentality rule than a parent corporation. Most of the factors necessary to satisfy the element of control "... to such a degree that the subsidiary has become a mere instrumentality ..." (see Steven v. Roscoe Turner Aeronautical Corporation, supra) are present in this case.
The evidence at trial demonstrated among other things that Mey, Inc. (held land title as nominee) and Town Construction Corp. (charter revoked for failure to file annual reports) were incorporated by the same man (Marvin Mitchell), their articles having been drawn up and signed on the same date (March 18, 1968); both had the same Resident Agent (Mitchell); both had the same Principle Office (2220 N. Meridian Street, Indianapolis, Indiana, the address of the law firm of Eskenazi, Mitchell & Yosha); and both had the same four officers and directors (Eskenazi, Mitchell, Yosha & Nelson, being the four partners of Old Town). Old Town acquired title to Phase II (the plot containing Langford's apartment) and conveyed the same to Mey, Inc. on the same day (May 29, 1968), and title was subsequently reconveyed to Old Town on July 9, 1969 ... all without any consideration moving between the parties. Mey, Inc. admittedly held title as nominee for the partnership. So the partners dealt with Mey, Inc.'s land as though it were their own.
During cross-examination regarding the complex, Marvin Mitchell testified:
"Well, we certainly, you know, we had an engineer or an architect draw the plans and certainly we approved them and made some changes in them. We *779 didn't conceive of them ourselves." (Our emphasis.)
From this testimony the jury could reasonably infer that "we" referred to the four individual partners, Eskenazi, Mitchell, Yosha and Nelson, demonstrating a disregard of the existence of the two corporations utilized in the purchase, planning, construction and sale of the apartment complex, i.e., the acts of the corporations were treated as the acts of the partners. Neither would it be unreasonable to conclude that these same four men were also the beneficial owners of both corporations.
In view of the degree of control exerted by the partners at each stage of the development of the Old Town Apartment complex the jury could conclude these two corporations were business conduits or instrumentalities conveniently utilized for the purpose of avoiding personal liability.
As to the second and third elements of the instrumentality rule, there was evidence from which the jury could conclude (1) that the parent (Old Town) through Town Construction Corp. committed a wrong against Langford by failing to inspect and construct the apartment in compliance with the building code and then renting the apartment with a concealed dangerous condition unknown to Langford; and (2) that an unjust injury to Langford would result if Old Town was allowed to maintain its corporate facade ... a facade which Old Town allowed to crumble by failing to file annual corporate reports before Langford filed his complaints.
Thus, the instrumentality rule justifies puncturing the corporate shields of Mey, Inc. and Town Construction Corp.[41]
Disregarding corporate entity may also be justified under the "alter ego" rule. See Feucht v. Real Silk Hosiery Mills, Inc., supra. Although often treated synonymously with the instrumentality rule (see 1 Fletcher Corporations ¶ 41.1 (perm. ed.rev. 1963)), the alter ego rationale should be treated as a separate legal theory, the distinction being the difference between describing a corporation as the instrument of its shareholder and describing a shareholder and his corporation as one. See Minifie v. Rowley, 187 Cal. 481, 487, 202 P. 673, 676 (1921); Note, supra, 48 B.U.L. Rev. at 137, n. 58.
To establish personal liability under this rule the Supreme Court of Indiana in Hinds v. McNair (1955), 235 Ind. 34, 129 N.E.2d 553, 566, said that "it takes [proof of] both ownership and control." (Our emphasis.)[42]
Control has already been established. While there was no direct evidence of ownership of the stock of either Mey, Inc. or Town Construction Corp., an inference reasonably arises that the partners of Old Town were the beneficial owners of the capital stock of these two corporations because of Old Town's complete dominance of the entire project from beginning to end, and every aspect thereof.
One of the partners (Max Nelson) demonstrated the casual attitude of Old Town towards its corporate character *780 when he testified that although a director of both corporations, he knew nothing of their operation.
Whether by application of the "instrumentality" or the "alter ego" rationale, or both, the jury could have justifiably looked through form to substance and treated Old Town and its four partners as the builder-owner-landlord of the Old Town Apartment complex.[43]
It should be now apparent that application of the implied warranty of habitability to a residential landlord does not transform him into an insurer of the safety of his tenants ... as charged by Old Town.
There is consensus among the decided cases that the implied warranty of habitability burdens the landlord with the duty to transfer the premises in a reasonably habitable condition at the inception of the lease and maintain the premises in a reasonable state of repair for the duration of the term. The landlord will indeed be liable to his tenant under traditional contract remedies for a failure to do so. However, in determining an actionable breach of such warranty the test is one of reasonablness (rather than perfection) as correctly stated in the trial court's implied warranty instruction, supra. See also Barnes v. MacBrown and Co., Inc., supra, and the cases following the Javins rationale, supra. Cf. Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314, 326 (1965). The landlord does not warrant against all minor defects that might occur. Liability does not attach for minor defects which do not render the apartment unreasonably fit and proper for the purposes intended... whether latent or developing after the lease's inception.[44]

*781 Negligence

CONCLUSION  It is our opinion that the evidence was sufficient to support the jury's verdicts against Old Town upon Langford's theory of negligence including negligence via res ipsa loquitur.
While the jury's verdicts are sustainable on the basis of Old Town's breach of its implied warranty of habitability, the verdicts (judgment) are also sustainable upon a negligence theory.
The requisite elements of an action in negligence are (1) the existence of a duty on the part of the defendant in relation to the plaintiff; (2) the failure of the defendant to conform his conduct to the standard of care demanded by such duty; and (3) an injury to the plaintiff proximately resulting from such failure. See Rieth-Riley Construction Co., Inc. v. McCarrell (1975), Ind. App., 325 N.E.2d 844, 855; Chamberlain v. Deaconess Hospital, Inc. (1975), Ind. App., 324 N.E.2d 172, 175; Dreibelbis v. Bennett (1974), Ind. App., 319 N.E.2d 634.
The duty which Old Town as a builder-owner landlord owed to its tenants was to design, construct, and maintain its apartment complex reasonably fit and safe for habitation. There was evidence (as discussed in ISSUE TWO, supra) from which the jury could reasonably conclude that Old Town negligently breached this duty by improperly designing and constructing Langford's apartment thereby positioning a wooden joist too close to the hot flue vent in direct violation of the building code and the manufacturer's own specifications.
The evidence also demonstrated that in the performance of its duty Old Town should reasonably be expected to conduct two inspections of the construction: (1) the first prior to installation of the dry wall in order to adequately inspect the pipe and duct work in the apartment (the "rough-in" inspection); and (2) the second following such installation in order to inspect the furnace hookup and operation. It was reasonably foreseeable that neglecting either inspection could unduly subject a tenant to a hidden danger making the apartments unsafe for the purpose of habitation. Yet, the record reveals that Old Town only conducted the latter inspection, never having adequately inspected (or caused to be inspected) the pipe and duct work in Langford's apartment.
No matter which "defect" existed in the design of the apartment or the heating system itself, the jury could reasonably conclude that Old Town's failure to inspect resulted in a dangerous condition which ultimately led to disaster.
We can also conclude that there was sufficient evidence to support application of the doctrine of res ipsa loquitur. Basically proof is required of exclusive control of the injuring instrumentality or agency in the defendant together with evidence showing that the accident ordinarily, or probably, would not have occurred if *782 due care had been exercised by those in control of such instrumentality. See Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Hoffman (1914), 57 Ind. App. 431, 107 N.E. 315, 319. The permissible inference of negligence so arising is to be weighed and considered along with other evidence of any specific acts of negligence and whatever evidence may be submitted in rebuttal. For an excellent discussion of the correct application of this doctrine, See Merriman v. Kraft (1969), 253 Ind. 58, 249 N.E.2d 485; New York, Chicago and St. Louis Railway Co. v. Henderson (1958), 237 Ind. 456, 146 N.E.2d 531. The uncontradicted testimony of both Langford and Jacob Crist, Old Town's resident manager, established that all maintenance and repairs of the furnace and heating system were the responsibility of Old Town. So Old Town retained control over the heating system which it improperly enclosed without adequate inspection. The result was a fire which ordinarily would not have occurred within two years from installation if due care had been exercised by those in control during the design and construction of the apartment.
Old Town adduced no evidence to rebut this permissible inference of negligence. In this connection we find particularly appropos this statement from Albin v. T.F. Barrett Construction Co., 232 F.2d 501 (7th Cir.1956):
"Barrett's [the defendant's] testimony gives no explanation of what caused the accident to occur. His testimony leaves uncontradicted and unexplained the undisputed fact that an instrumentality built and maintained by defendant, under normal winter weather conditions, fell outward upon a public sidewalk. It was not built for the purpose of thus falling. It follows that there was some defect in the construction or use by defendant. Here was a situation for a typical application of the doctrine of res ipsa loquitur. The presumption arising from that doctrine was not, as a matter of law, overcome by Barrett's testimony. Instead, the presumption and his testimony, together with the other evidence, furnished a factual basis from which the jury could properly find that the defendant was negligent." 232 F.2d at 503.
Thus there was evidence of specific acts of negligence considered with the permissible inference drawn from res ipsa loquitur to support the reasonable inference that Old Town was negligent.
ISSUE FOUR
Did the trial court err in instructing the jury that the exculpatory and save harmless provisions in the form lease were invalid as a matter of law?

ADDITIONAL FACTS
Langford and his wife, Francis, executed the lease for their apartment on December 13, 1970, in the presence of Jacob Crist, manager of the Old Town Apartment complex. The lease presented to them by Crist was a printed form contract drafted and copyrighted by Eskenazi, Mitchell & Yosha, an Indianapolis law firm having three of the same partners as Old Town. Crist's deposition stated that he had never received any explanation from Old Town as to the legal effect of the terms of Langford's lease nor had he been instructed to explain or call attention to any particular provision. He further stated that neither Mr. or Mrs. Langford read the entire lease and that no particular provision was explained or called to their attention prior to signing.
The lease contained Articles 19 and 20 as follows:
"19. LESSORS' NON-LIABILITY. It is agreed that the Lessor shall not be liable to the Lessee or any other person on the demised premises or in the building or adjoining grounds and parking lot, by the Lessee's consent, invitation or license, expressed or implied, for any damages either to person or property, sustained by reason of the condition of *783 said premises or building or any part thereof, or arising from the bursting or leaking of any water, gas, sewer, or steam pipes, or due to the act of neglect of any employee of the Lessor, or the act of any co-tenant or any occupant of said building or other person therein, or due to any casualty or accident in or about said building.
"20. LESSEE'S LIABILITY. The Lessee agrees to be responsible for any damage to the property of the Lessor which may result from any use of the demised premises, or any act done thereon by the Lessee or any person coming or being thereon by the license of the Lessee, expressed or implied, and will also save the Lessor harmless from any liability. The Lessee agrees to save the Lessor harmless from all costs, damages or losses resulting from their conduct or acts relating to or in and about the demised premises." (Emphasis supplied.)
In view of these exculpatory and save harmless clauses the trial court gave this instruction to which Old Town made timely objection:
"Any provisions in the lease involved in this case which attempt to exculpate, excuse or release defendant Old Town Development Company from its own wrongful acts or omissions, or which provide that the Lessee shall indemnify or hold harmless defendant Old Town Development Company from injuries or damages resulting therefrom, are unreasonable and unenforceable under the law of this state. The lease is to be construed most strictly against defendant Old Town Development Company, and any ambiguities in such lease are to be construed against defendant Old Town Development Company."

(Langford's Instruction 10)

(Emphasis supplied.)

CONTENTIONS OF THE PARTIES
Old Town contends that the trial court erred in expressly instructing the jury that any exculpatory clause in the present lease agreement was unreasonable and invalid as a matter of law. In the absence of evidence that the contract was in fact unconscionable due to a great disparity of bargaining power or lack of mutuality, Old Town argues that an exculpatory clause is valid in Indiana and must be enforced to relieve the lessor from liability.
Langford responds that in the absence of any evidence that he knowingly and willingly assumed the risk of Old Town's own negligence, the trial court properly withdrew the question of the enforceability of the exculpatory provision from the jury's consideration. In fact, the submission of the question to the jury under such circumstances would amount to reversible error under recent Indiana precedent.

DECISION
CONCLUSION  It is our opinion that the trial court's instruction as to the invalidity of the exculpatory and save harmless provisions under these circumstances is not reversible error.
Devotees of recent developments in Indiana case law reading Articles 19 and 20 of this lease relieving Old Town as lessor from liability for personal injury or property damage resulting from its negligence and requiring reimbursement from Langford as lessee for any such liability so incurred, will immediately be reminded of Indiana's landmark case on the subject of exculpatory clauses ... Weaver v. American Oil Co. (1971), 257 Ind. 458, 276 N.E.2d 144 ... a case which has received national recognition in this area and the text of which appears in 49 A.L.R.3d at page 306, and is further treated in the annotation following at 49 A.L.R.3d 321, et seq., titled Validity of Exculpatory Clause In Lease Exempting Lessor From Liability.
Before examining Weaver, which we consider controlling, some prefatory observations about exculpatory clauses may be helpful.
*784 While most jurisdictions recognize in the abstract the validity of lease exculpatory clauses, they are ordinarily viewed with disfavor and subject to strict construction.[45] Obviously this is so because such clauses act to shift an onerous burden, i.e., the lessor escapes liability for future negligent conduct by shifting the burden of an otherwise fixed legal responsibility to the lessee. Any such oppressive risk-shifting device has inevitably led to counter-measures, which is evident in the burgeoning cases and treatises on this subject.
There are, however, numerous cases supporting the broad proposition that in the absence of prohibitive statutes leasehold exculpatory agreements are valid and enforceable. 57 Am.Jur.2d Negligence §§ 20-31; Restatement of Contracts § 574, at 1079 (1932); Annot., 49 A.L.R.3d 321, 328 (1973).
The rule is grounded on the doctrine of freedom of contract which presupposes that such clauses are negotiated by private parties of nearly equal bargaining power. It has also been said in justification of the rule that the relationship of landlord and tenant is not a matter of public interest but purely a private affair so that such clauses cannot be held void on public policy grounds. And some courts have justified exculpatory provisions as induced by consideration in the form of lower rent.
Increasingly in recent years courts are finding public policy considerations against the enforcement of these clauses because of housing shortages, large apartment complexes, and the existence of public housing laws.
In hedging the rule with numerous limitations, courts have looked to various modifying factors.[46]
One of the first and foremost of these modifying factors is to negate the enforceability of an exculpatory clause if instead of being on an approximate equal footing there is a proven marked disparity between the bargaining position of the parties so that the tenant must either accept what is offered or be deprived of the rental property. This factor was a major ground for the decision in Weaver v. American Oil Co., supra.
Another restriction placed on exculpatory clauses has been to relieve the landlord from acts of passive negligence, but not to relieve him from the results of his active negligence.
The tenants lack of awareness or understanding of the existence or effect of an exculpatory provision has been another limiting factor. This circumstance too existed in Weaver.
Last but far from least, such clauses have been held void when found by the court to have been executed under circumstances making the exculpatory provision an "unconscionable" one. Again, Weaver is a prime example.
After examining the developing exceptions to the so called general rule of enforceability of exculpatory clauses, the conclusion seems inescapable that the general rule is more honored in the breach than in the observance.
And so we arrive at a consideration of Weaver. As the relatively uneducated lessee of a filling station, Weaver repeatedly signed a lease with American Oil containing both exculpatory and save harmless provisions similar to the clauses before us. Weaver did not read the lease and American Oil's agent made no effort to call his attention to the clauses in question. He signed the printed form lease prepared by American Oil Co.'s attorneys when their agent directed him to do so on a "take it or leave it" basis.
*785 In nullifying the obnoxious provisions, then Chief Justice Arterburn speaking for the majority borrowed a concept from the Uniform Commercial Code and characterized the lease as an "unconscionable contract," stressing the disparity in the bargaining power of the parties. The decision placed a burden on the lessor to demonstrate that in submitting a printed form lease containing hidden clauses the other party had knowledge of "any unusual or unconscionable terms contained therein."
Like Weaver, Langford and his wife signed a printed form contract without reading or having it called to their attention that they were subjecting themselves to unlimited liability for the negligence of their lessor. Like Weaver the lease the Langfords signed contained both an exculpatory and a save harmless clause and their bargaining position compared unfavorably with the lessor. Like Weaver the execution of the lease between the Langfords and Old Town was a mere formality and it could reasonably have been inferred by the fact finder that the lease was tendered on a take it or leave it basis.
Unlike Weaver, the Langfords appeared to have been better educated and signed a residential (apartment) lease, not a commercial lease.
The fact that a residential (apartment) lease was involved is of no consequence. We agree with the conclusion of Professor Love in a recent article[47] analyzing exculpatory provisions that it is more important to determine if the parties are in a substantially unequal bargaining position (citing Weaver) and would add, it is less likely that residential lessees will be sophisticated in the ways of business and in as strong a bargaining position as commercial lessees.
It should be emphasized that the court in Weaver expressly recognized that parties may include exculpatory and indemnifying provisions in lease agreements, but it "must be done knowingly and willingly." 276 N.E.2d at 147, 148 (original emphasis).
And the court went on to say:

"The burden should be on the party submitting such `a package' in printed form to show that the other party had knowledge of any unusual or unconscionable terms contained therein." (Our emphasis.)
Old Town has not sustained the burden required by Weaver.
The lesson of Weaver is not that lessees are excused from reading leases or that they are necessarily relieved from liability resulting from exculpatory and save harmless clauses, but rather that they may not be intimidated or tricked into assuming unlimited liability under circumstances making it unconscionable for them to be bound by booby trap clauses hidden away in a printed form lease prepared by the lessor. Under such circumstances, to allow a lessor to require a lessee to assume the lessor's negligence and to indemnify the lessor for the lessor's own negligence, is to allow a wary landlord to ambush an unwary lessee.[48]
*786 Cases from other jurisdictions have reached a similar result. For instance in McCutcheon v. United Homes Corporation, 79 Wash.2d 443, 486 P.2d 1093 (1971), the Washington Supreme Court refused to hold the landlord immune from liability because an exculpatory clause relating to common areas in a multi-family dwelling:
"Thus, we are not faced merely with the theoretical duty of construing a provision in an isolated contract specifically bargained for by one landlord and one tenant as a purely private affair. Considered realistically, we are asked to construe an exculpatory clause, the generalized use of which may have an impact upon thousands of potential tenants.
"Under these circumstances it cannot be said that such exculpatory clauses are `purely a private affair' or that they are `not a matter of public interest.' The real question is whether we should sanction a technique of immunizing lessors of residential units within a multi-family dwelling complex, from liability for personal injuries sustained by a tenant, which injuries result from the lessor's own negligence in maintaining the `common areas'; particularly when the technique employed destroys the concept of negligence and the standard of affirmative duty imposed upon the landlord for protection of the tenant."
Also see Strauch v. Charles Apartments Co., 1 Ill. App.3d 57, 273 N.E.2d 19 (1971); Jackson v. First Nat. Bank, 415 Ill. 453, 114 N.E.2d 721 (1953); Cardona v. Eden Realty Co., 118 N.J. Super. 381, 288 A.2d 34 (1972); Tenants Council of Tiber Island-Carrollsburg Square v. DeFranceaux, 305 F. Supp. 560 (D.D.C. 1969); Galligan v. Arovitch, 421 Pa. 301, 219 A.2d 463 (1966); Annot., 49 A.L.R.3d 321 (1973).
Two Indiana cases need be distinguished, Franklin Fire Insurance Co. v. Noll (1945), 115 Ind. App. 289, 58 N.E.2d 947 and Loper v. Standard Oil Co. et al. (1965), 138 Ind. App. 84, 211 N.E.2d 797. In both cases the lessees were substantial corporate entities apparently bargaining with the lessor on equal or better terms with full knowledge of the impact of the burden they were assuming. Both cases further stand for the proposition that exculpatory clauses as such do not violate the public policy of this State. They could be characterized as classic examples of freedom of contract between private parties, with one party knowingly and willingly assuming another's negligence. The Appellate Court recognized the limited extent of its holding in Franklin Fire Insurance Co.:
"We do not say that there may not be facts and circumstances which could be averred, but not now before us, upon which the court would be warranted in holding that a similar provision contained in a lease would be null and void as unconscionable." 115 Ind. App. at 295, 58 N.E.2d at 949.
While the wording of the first sentence of Instruction 10 might appear misleading as suggesting that exculpatory and save harmless lease provisions are unenforceable under Indiana law, its proper meaning is saved by reference to the "provisions in the lease involved in this case ..." (our emphasis) and by the further reference to strict construction, all of which negates the idea that exculpatory clauses per se are invalid.
*787 So because Old Town failed to present any evidence that Langfords "knowingly and willingly" agreed to Articles 19 and 20. the trial court correctly instructed the jury that such "... provisions in the lease involved in this case ..." are invalid as a matter of law.
ISSUE FIVE
Was the verdict for $354,000 rendered for Langford in his individual capacity so outrageous as to evidence passion and prejudice, and therefore excessive?[49]

CONTENTIONS OF THE PARTIES
Old Town contends that Langford's recovery in his individual action was grossly excessive, the obvious result of unbridled prejudice and passion on the part of the jury.
Langford replies that the contention of Old Town is completely without basis in the record. Old Town made no effort to logically discuss the various elements of damage composing Langford's claim; and in fact, the evidence clearly shows that the verdict was in no way shockingly disproportionate.

DECISION
CONCLUSION  It is our opinion that the contested verdict is not so excessive as to constitute reversible error on appeal.
The Indiana rule governing determination of excessive damages is of ancient vintage. It can be traced back to Coleman v. Southwick (1812), 9 Johns (N.Y.) 45, 6 Am.Dec. 253:
"`* * * The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line, for they have not standards by which to ascertain the excess.' (Emphasis supplied.)"
The Rule has been developed through the years in such cases as, Northern Indiana Public Service Co. v. Otis (1969), 145 Ind. App. 159, 250 N.E.2d 378; City of Evansville v. Cook (1974), Ind. App., 319 N.E.2d 874; Rieth-Riley Construction Co., Inc. v. McCarrell (1975), Ind. App., 325 N.E.2d 844, 855; New York Central Railroad Co. v. Johnson (1955), 234 Ind. 457, 127 N.E.2d 603; Hahn v. Moore (1956), 127 Ind. App. 149, 133 N.E.2d 900, Reh. denied 134 N.E.2d 705; Dudley Sports Co. v. Schmitt (1972), 151 Ind. App. 217, 279 N.E.2d 266; State of Indiana v. Daley (1972), 153 Ind. App. 330, 287 N.E.2d 552.
In Kavanagh v. Butorac (1967), 140 Ind. App. 139, 221 N.E.2d 824, this court said:
"For a formula then, our common law sets only the general guidelines for compensating the victim, each in its own way to be considered by the trier of facts and weighed to determine what the total compensation will be. Because of this personal nature of each case and since the decision is unique to the particular set of facts our courts have said the trier of facts is to be given `sound discretion,' and `liberal discretion' where damages cannot be defined and calculated with mathematical certainty or by any exact standard." (Emphasis supplied.)
The cases also support the proposition that an awareness of general inflation and the constant depreciation and cheapening of money is within the zone of discretion given to the trier of fact when assessing damages. New York Central Railroad Co. v. Johnson, supra; Hahn v. Moore, supra; Northern Indiana Public Service Co. v. Otis, supra. And further *788 ... reversal is not justified if the amount of damages awarded is within the scope of the evidence before the court. Northern Indiana Public Service Co. v. Otis, supra; First Bank & Trust Co. of South Bend v. Tellson (1954), 124 Ind. App. 478, 118 N.E.2d 496.
So in order for us to reverse the verdict for excessiveness it "must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption." Kavanagh v. Butorac, supra, and cases cited above.
Recognizing that awarding of damages in this kind of case is not an exercise in mathematical certainty, the jury was properly instructed on the subject ... in part by instructions supplied by Old Town. The jury was instructed to consider: (1) personal injuries suffered by Langford, including pain and suffering, reasonable expenses of medical care, treatment and surgical services, and any aggravation of a previously existing physical condition (alcoholism); (2) the reasonable value of personal property destroyed in the fire; and (3) damages recoverable as a result of the wrongful death of his two minor children (Gregory and Denise).
The jury awarded Langford a total of Three Hundred Fifty-Four Thousand Dollars ($354,000.00) in his individual action for loss of personal property and the painful personal injuries suffered by him as a result of being forced to jump through a plate glass window and the pecuniary loss of his two minor children. Five of his ribs were fractured, one lung collapsed, his feet were burned and his left hand was severely cut. He spent twenty (20) days in the hospital and underwent three (3) surgical procedures. During this time, and for some three to four months thereafter, he was in constant extreme pain. The jury could have included mental suffering accompanying his injuries as well as physical pain and suffering. Montgomery v. Crum (1928), 199 Ind. 660, 161 N.E. 251; Kline v. Kline (1922), 158 Ind. 602, 64 N.E. 9; Cauldwell, Inc. v. Patterson (1961), 133 Ind. App. 138, 177 N.E.2d 490.
The jury could also have considered the aggravation of the alcoholism with which Langford was afflicted. Also he lost all personal property and personal effects accumulated by him and his family during twenty (20) years of marriage which were situated in his three (3) bedroom apartment. And it was proper for the jury to consider the pecuniary injury suffered by Langford in the loss of his two minor children, Denise, age 11, and Gregory, age 19. Hahn v. Moore, supra; Allison v. Boles (1967), 141 Ind. App. 592, 230 N.E.2d 784. Langford also had incurred certain medical, hospital and funeral expenses totalling Three Thousand Nine Hundred Forty-Seven 46/100 Dollars ($3,947.46).
We are unable to say that the amount of damages awarded is not within the scope of the evidence before the jury or that the verdict is beyond all reasonable limits of the evidence presented or that these damages are so excessive as to be flagrantly outrageous and extravagant or that the jury was motivated by passion or prejudice. We can only conclude that the verdict in the amount of Three Hundred Fifty-Four Thousand Dollars ($354,000.00) is not excessive by these standards.
Finding no reversible error under this or any issue, the judgment of the trial court is affirmed.
Affirmed.
SULLIVAN, J., concurs with opinion.
WHITE, J., dissents with opinion.
SULLIVAN, Judge (concurring).

*789 ISSUES ONE AND TWO
I agree with Judge Buchanan that Old Town has failed to present us with cause for reversal as to either Issue One (the propriety of the "implied warranty" instruction) or Issue Two (the correctness of the "strict liability" instruction). However, my assent is based on reasoning significantly different as to several points. Because much of my disagreement with the primary opinion with respect to these issues is founded upon my belief that no error whatever as to Old Town can be predicated upon the giving of Langford's "strict liability" instruction, my discussion of Issues One and Two is consolidated for purposes of this opinion.
Two facts must be noted which are in my view critical to proper treatment of this appeal: (1) Old Town was not merely Langford's landlord, but was also the builder of the demised premises; and (2) the fire which caused Langford's injuries resulted from a "defective condition"[1] present in the leased premises when it left Old Town's control as builder-lessor. We therefore need not be concerned with Old Town's rights and liabilities when viewed only as a lessor, nor with situations in which the damage-causing condition arises only after the tenant comes into possession. The following discussion is limited by the particular facts of this case.
It is my view that the decisions of Theis v. Heuer (1971), 149 Ind. App. 52, 270 N.E.2d 764, adopted on transfer (1972) Ind., 280 N.E.2d 300, and Barnes v. MacBrown & Co., Inc. (1976), Ind., 342 N.E.2d 619, control our disposition of Issues One and Two. I believe that, on the facts of this case, Theis and Barnes, read together and in light of the decisions' supportive reasoning and precedent, require us to approve both Langford's "implied warranty" and "strict liability" instructions as to Old Town.
Theis and Barnes affirm that an "implied warranty of fitness for inhabitation", Theis, supra, 280 N.E.2d at 306, runs from the builder-vendor of a new house to the first and subsequent vendees. Judge Buchanan has thoroughly reviewed the policy bases of those decisions and I shall not attempt to reiterate that discussion in any detail. Suffice it to say that I agree with Judge Buchanan that those policies permit no distinction between residential property acquired from the builder by a contract of lease, and residential property obtained by a contract of sale.
Neither Theis nor Barnes dealt with a plaintiff-vendee who had suffered personal injuries as a result of the builder-vendor's breach of warranty; rather, the injured parties in those cases complained only of "economic loss" in contract concepts, i.e., the "loss of bargain". The Supreme Court in Barnes did state, as to the scope of the "warranty", that "[t]he contention that a distinction should be drawn between mere `economic loss' and personal injury is without merit." 342 N.E.2d at 621. This leads me to believe that Barnes mandates the conclusion that, upon "breach" of the builder's "warranty", the injured party may recover for injuries to his person or personal property as a part of his consequential damages.
It is as to what constitutes a "breach" by the landlord-builder of his "warranty" that serves as the springboard for my disagreement with the primary opinion here. The discussion under Issue Three, primary opinion pp. 774-775, holds that a defendant in Old Town's position is not in "breach" of his "warranty" unless his failure to live up to his obligation to provide a leasehold substantially free of defects is tantamount *790 to negligence, i.e., he "must receive notice of the allegedly defective condition and a reasonable time to correct it before the tenant can assert a breach of the warranty of habitability." From this view of the nature of the defendant's obligation, it is not illogical to reject "strict liability" and to conclude that the builder-lessor is liable "for personal injury and property damage in tort under traditional negligence principles." Primary opinion p. 774. But in my view, such is inconsistent with the principles relied upon by the decision in Theis. The inconsistency not only undercuts those principles but is not justified by any sound reason of law or policy.
A crucial aspect of the decision in Theis is that it is based in large part upon analogy to the law of products liability. See Theis v. Heuer, supra, 280 N.E.2d at 304, 306. The viability of the analogy was reaffirmed by the Supreme Court in Barnes, where, in the course of its decision abolishing privity as a limitation on the builder-vendor's "implied warranty", the court stated that "[t]o the extent discussed ..., we do not see that the sale of real estate should be treated differently from the sale of personal property." 342 N.E.2d at 621. Indeed, much of Judge Buchanan's opinion, to imply a "warranty of habitability" into the transaction between builder-lessor and lessee, and to abolish the former's tort immunity, is based upon analogy to transactions in "products". Yet Judge Buchanan today stops short of following that analogy to the point I feel it must lead.
In implying into the builder-vendor's transaction a "warranty of fitness", the court in Theis relied, inter alia, upon the decision of the New Jersey Supreme Court in Schipper v. Levitt & Sons, Inc. (1965), 44 N.J. 70, 207 A.2d 314. The unanimous decision in Schipper was that a defendant engaged in the business of building and selling houses could be held liable for personal injuries suffered by a vendee as the result of a defect in the house without regard to fault. In so holding, the Schipper court relied heavily upon the principles and policies in the products liability area, terming them principles of "warranty or strict liability." 44 N.J. at 90, 207 A.2d at 325 (emphasis supplied). Cf. Comment to § 402A, 2 Restatement of Torts 2d (1964); 2 Frumer & Friedman, Products Liability § 16A[4][a], pp. 3-262.5 - 3-262.6 (1975). The reasoning of the court in Schipper is to me highly persuasive as to our appropriate treatment of Issues One and Two:
"... the plaintiffs contend that Levitt [the builder-vendor] should be held liable `for a breach of warranty of habitability where a dangerous condition causes injury to a subsequent occupant.' They point to the developing law in the products liability field; that law has moved from MacPherson [MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696 (1916)], where negligence principles were applied to sustain liability, to Henningsen [Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960)], where a breach of an implied warranty of merchantability was the basis for holding Chrysler liable for injury caused by a defective automobile, to Santor [Santor v. A. & M Karagheeusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965)], where strict liability was applied to hold the manufacturer of a defective rug liable to a customer who purchased it from a retail dealer. The plaintiffs acknowledge that in the realty field there has thus far been no comparable movement in our State, but they suggest that it may no longer justly be put off since there is, in today's society, no reason for differentiating mass sales of homes from advertised models, as in the Levitt operation, from mass sales of automobiles from advertised models, as in the Chrysler operation.
* * * * * *
[In Santor, supra] We noted that the manufacturer's responsibility to the ultimate *791 consumer presents an ever growing problem which is properly being dealt with `step by step' and approved, in lieu of warranty terminology, the strict liability in tort terminology voiced in Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897. In summary, we reaffirmed the sweeping implications of Henningsen and reasserted that, when a manufacturer presents his products for sale to the public he accompanies them with an implied representation that they are reasonably fit for the intended use, and he is subject to an enterprise liability, the purpose of which is to insure that the cost of injury or damage resulting from defective products is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. Santor v. A & M Karagheusian, supra, 44 N.J. 52 at p. 65, 207 A.2d 305 at p. 312.
* * * * * *
We consider that there are no meaningful distinctions between Levitt's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. That being so, the warranty or strict liability principles of Henningsen and Santor should be carried over into the realty field, at least in the aspect dealt with here." 44 N.J. at 88-90, 207 A.2d at 324-325.
In my view, the court's reliance upon Schipper in Theis v. Heuer indicates that our Supreme Court contemplated this "warranty" to be one which is breached by noncompliance with its terms, i.e., a failure to supply premises free of defects rendering it uninhabitable. Such a "warranty" leaves no room for conditioning the warrantor's "breach" upon his negligence  the liability is, and must be, "strict".
Moreover, the considerations of public policy relied upon by the New Jersey Supreme Court in Henningsen v. Bloomfield Motors, Inc., supra; Santor v. A & M Karagheusian, Inc., supra, and Schipper v. Levitt & Sons, Inc., supra, are the same as those which underpin § 402A of the Restatement of Torts 2d (the terms of which clearly form the basis of Langford's Instruction) and which our courts have approved. See Chrysler Corp. v. Alumbaugh (3d Dist. 1976), Ind. App., 342 N.E.2d 908; Perfection Paint & Color Co. v. Konduris (1970), 147 Ind. App. 106, 113-114, 258 N.E.2d 681, 685; Cornette v. Searjeant Metal Products, Inc. (1970), 147 Ind. App. 46, 52-53, 258 N.E.2d 652, 656. See also Comment c. to § 402A; Vandermark v. Ford Motor Co. (1964), 61 Cal.2d 256, 37 Cal. Rptr. 896, 391 P.2d 168; Greenman v. Yuba Power Products, Inc. (1962), 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049; Prosser, Law of Torts § 97, pp. 650-651, § 98, pp. 656-657 (4th Ed. 1971); Prosser, Strict Liability to the Consumer in California, 18 Hastings L.J. 9 (1966); Noel, Defective Products: Extension of Liability to Bystanders, 38 Tenn.L. Rev. 1 (1970); 2 Frumer & Friedman, supra, § 16A [k], p. 3-237 et seq.; Traynor, The Ways & Meanings of Defective Products and Strict Liability, 32 Tenn.L.Rev. 363 (1965). Nothing in Judge Buchanan's opinion here belies my conviction that "the reasons for imposing strict liability on the more traditional products liability defendants are equally applicable to [builder-] lessors of real property." Love, Landlord's Liability for Defective Premises, supra, at 136.[2]
It is of course true that Old Town, unlike the defendant-builder in Schipper, *792 transferred possession of the property to the plaintiff by means of a lease rather than a sale. One of the reasons stated in Judge Buchanan's opinion here for refusing to go beyond negligence liability to strict liability is that "... the lease is usually for a short term with the lessor retaining title to the residential space... ." Primary opinion p. 768. Such a consideration cannot serve as the basis for distinguishing Schipper and limiting the builder-landlord's liability to negligence. That distinction, at least as to the defendant who is more than a "casual seller", bears little relationship to the policy considerations which compel application of strict liability. Courts in other jurisdictions have so recognized and have applied strict liability in tort to commercial lessors of products. See Cintrone v. Hertz Truck Leasing & Rental Service (1965), 45 N.J. 434, 212 A.2d 769; Price v. Shell Oil Co. (1969), Cal. App., 79 Cal. Rptr. 342, aff'd. (1970), 2 Cal.3d 245, 85 Cal. Rptr. 178, 466 P.2d 722; Stang v. Hertz Corp. (1972), 83 N.M. 730, 497 P.2d 732, 52 A.L.R.3d 112; Stewart v. Budget Rent-A-Car (1970), 52 Haw. 71, 470 P.2d 240. The logic of these cases has been accepted by this court in Perfection Paint & Color Co. v. Konduris, supra, 147 Ind. App. at 114, 258 N.E.2d at 686:
"The accomplishment of the Restatement's [of Torts 2d] stated objectives and the protection which flows therefrom is not dependent upon a `sale'... . A technical and complete sales transaction, while being a common and easily recognizable commercial transaction which comes within the purview of the rule of `strict liability'. To limit the rule to only those situations in which there has been an actual sale would be to circumscribe the rule to such an extent that its purpose might be defeated."[3]
Accord, Link v. Sun Oil Co. (1st Dist. 1974), Ind. App., 312 N.E.2d 126, 130 (trans. den.) It cannot be denied that Old Town is in the business of placing its apartments "on the market" within contemplation of the above-cited cases.[4]
In addition to pointing to the fact that Old Town leases rather than sells its apartments as a reason for not applying strict liability, Judge Buchanan's opinion cites the "dissimilarities" between "goods" and the "real estate" which is Old Town's product. Primary opinion p. 766. But this thought runs counter to the entire thrust of the court's treatment of Issue One. There, for purposes of approving an "implied warranty", that which Old Town supplies its tenants is characterized as "a package consisting of living space", primary opinion p. 762, or "`a well-known package of goods and services  a package which includes not merely walls and ceilings, but also adequate heat, lights, and ventilation, servicable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance.'" Primary opinion p. 756. We cannot have it both ways.
The primary opinion's characterization of an apartment as a "package of goods", necessarily implying an analogy to the law of products liability, in its justification of the "implied warranty" presents a further source of disagreement. While the court relies upon a products analogy in support of the "warranty" concept, and even cites *793 the importance of the modern commercial landlord's "superior position ... to inspect and maintain complicated modern machinery and equipment ... largely under his control", and his ability to "distribute the risk of loss by purchasing liability insurance ...", primary opinion p. 762, as reasons for abolishing tort immunity and imposing a standard of reasonable care, the court refuses to follow these § 402A concepts and approve Langford's Instruction 7. No consideration of public policy is cited for the refusal to go beyond the duty to which "`a landlord should at least be held ...,'", primary opinion p. 762 (original emphasis). The basis for the court's refusal to so hold is given in terms of "dissimilarities" between leases and sales, realty and personalty, distinctions which the court has itself discredited by adopting an "implied warranty" of habitability. I cannot concur in such a course.[5]
It is apparent to me that Judge Buchanan's opinion, at least sub silentio, concedes the logic of my position by its adoption, in Issue Three, of a concept whereby a builder-landlord like Old Town is "... `presumed to have knowledge of any latent defects in the original construction of the building.'" Primary opinion p. 775 (original emphasis). As Judge Buchanan concedes, this concept "carries strong overtones of strict liability." Primary opinion p. 775. I submit that employment of the "presumed knowledge" legal fiction does more than that  it is strict liability. If this is indeed the case, Langford's Instruction 7 should not be rejected. It seems to me that no useful purpose is served by doing indirectly what could be done directly with a more logical adherence to the principles and policies which form the basis of decision in Theis v. Heuer and the acceptance of Instruction 6 in Issue One. My objections are not merely pedantic. There is virtue in the predictability which consistency begets. This is especially true when the principles of law which I seek to apply to this case are firmly grounded in policy considerations to which we have consistently (at least since Perfection Paint in 1970) adhered.
In so stating I re-emphasize the fact that Old Town is the builder and do not disagree with Judge Buchanan's caveat concerning possible § 402A strict liability as applied to a nonbuilder. See primary opinion, pp. 768-769, 776.
Believing as I do that the trial court did not err in instructing the jury that Old Town could be held strictly liable in tort for Langford's injuries, I do not reach the question of any prejudice to Old Town. I do not, however, disagree with Judge Buchanan's analysis of three possible defects upon which Old Town's liability could have been premised, insofar as that analysis carries over into the discussion of the sufficiency of the evidence in Issue Three. But I do not concur in any implication that Old Town's liability in "warranty" depends on its privity with Langford because such implication would contravene the Supreme Court's recent decision in Barnes v. MacBrown & Co., Inc., supra.

*794 Issue Three
I agree with Judge Buchanan that sufficient evidence was presented for the jury to hold Old Town liable under either an "implied warranty" or "negligence" theory, based upon the three possible defects discussed in Issue Two. Further, I believe that the evidence allowed the jury to find Old Town liable under the "strict liability" concept embodied in Langford's Instruction 7. As might be inferred from my preceding discussion, I am in substantial agreement with Judge Buchanan with respect to the seriousness of the "defect" necessary for liability to be found under either Instruction 6 or Instruction 7. Primary opinion, pp. 780-781 n. 44.[6]
Since we are concerned here only with a defect present at the inception of the lease term, and since I believe strict liability is applicable to Old Town, I do not reach nor comment upon Judge Buchanan's discussion of a lessor's rights and liabilities as to defects arising after the tenant takes possession nor upon the question of "notice" related thereto. Primary opinion, pp. 774-776. I do not, however, disagree with Judge Buchanan's "piercing of the corporate veil". Primary opinion pp. 776-780. On the contrary, I concur in that discussion and the necessity and propriety of "piercing" Old Town's "veil" herein, inasmuch as such is essential to my view of Old Town as builder-landlord.

ISSUE FOUR
I am in substantial agreement with nearly all that the primary opinion says on this issue. However, the exculpatory clauses were not invalid as a matter of law. They were invalid only because Old Town failed to submit evidence sufficient to raise a factual issue of whether or not they were "knowingly and willingly" agreed to by lessees. Weaver v. American Oil Co. (1971), 257 Ind. 458, 464, 276 N.E.2d 144. The absence of such evidence clearly required the court to withdraw the issue from the jury. Accordingly, there was no prejudice to Old Town in the court's telling the jury that the clauses were invalid.

ISSUE FIVE
I concur with Judge Buchanan.
For the reasons expressed above, I concur in the conclusion reached by the primary opinion that the judgment herein must be affirmed.
WHITE, Judge (dissenting).
If, or to the extent that, the prevailing opinion holds that the proprietor-landlord-lessor of a residential apartment complex owes his tenants, their families, and their licensees, the duty to exercise reasonable care to maintain such apartments in a reasonably safe condition, I concur. Failure to perform that duty is negligence which, if it proximately results in injury to the person or property of those to whom the duty is owed (and who are not contributorily negligent), will subject the landlord to liability for the damages which ensue. If that is what the opinion means when it holds that "a landlord is liable to his tenant ... for personal injury and personal property damage in tort under traditional negligence principle", I am in agreement.
There is probably much else in the opinion with which I could agree could I be certain that I understand its precise meaning. Among such agreements would be the rejection of strict liability. Thus, I agree that it was error to give Langford's *795 jury instruction No. 7 (strict liability), but I cannot agree that it was harmless error. There was more than a mere possibility that the jury's verdict was predicated upon that instruction. In fact the evidence of the landlord's negligence is so meager that to presume the jury awarded damages on that theory rather than strict liability, is unrealistic. It therefore does not appear that the right result was reached and it should not be presumed that the landlord was not prejudiced by the strict liability instruction. Honey Creek Corp. v. WNC Development Co. (1st Dist. 1975), Ind. App., 331 N.E.2d 452, 458; Baker v. Mason (1968), 253 Ind. 348, 350, 242 N.E.2d 513.
I also agree that the damages are not excessive. Therefore, I would reverse the judgment and remand the cause for a new trial on the issue of liability only, under jury instructions consistent with the views I have expressed. If the verdicts are for the plaintiffs, judgments should be in the amounts awarded in the prior verdicts.
NOTES
[1] The leasehold adhered to the common law concept of the fee in this regard, being more specifically characterized as a conveyance of an interest in a nonfreehold estate. See

Love, Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability?, 1975 Wis.L.Rev. 19, pp. 23-31 (1975); Grimes, Caveat Lessee, 2 Valparaiso U.L.Rev. 189, 190, 192 (1968); 2 R. Powell, The Law of Real Property ¶ 225[2][a], at 232 (rev. ed. 1973) [hereinafter cited as 2 Powell]; Note, Landlord v. Tenant: An Appraisal of the Habitability and Repair Problem, 22 Case W.Res.L.Rev. 739 (1971); 1 American Law of Property § 3.45, at 267 (A.J. Casner ed. 1952) [hereinafter cited as ALP] Note, The Uniform Residential Landlord and Tenant Act: Reconciling Landlord-Tenant Law with Modern Realities, 6 Ind. L.Rev. 741 (1973).
[2] Id.
[3] Id.; 2 W. Blackstone, Commentaries 299 (1803). In words of Lord Coke:

"Note, that by the civil law every man is bound to warrant the thing that he selleth or conveyeth, albeit there be no expresse warranty ... either in deed or in law; but the common law bindeth him not, for caveat emptor ... ." 2 E. Coke, A Commentary on Littleton. 102(a) c. 7, § 145 (1853 ed.).
[4] See note 1 supra.
[5] Id. As Professor Grimes commented:

"Counsel for lessees, while accepting the caveat lessee rule as part of their fate, did not despair, but attacked on the perimeter. From these legal battles three concepts evolved:
"(a) The basic philosophy that there is no implied covenant of fitness of use at the outset, and the satellite theories that;
"(b) there is no implied covenant of continued fitness of use during the duration of the lease; and
"(c) the lessor is not liable to the lessee nor to others for torts resulting from the condition of the premises.
"The sanctity of these doctrines has been almost universally admitted. Their opposition has centered the attack upon `exceptions' to the stated rules."
Grimes, supra note 1, at 196. (Our emphasis.)
[6] See Love, supra note 1, at 27-31; Grimes, supra note 1, at 198-199.
[7] See Love, supra note 1, at 26-31 (and authorities cited therein); Grimes, supra note 1, at 193 (and authorities cited therein).
[8] Id.
[9] See Love, supra note 1, at 28-31; Grimes, supra note 1; Note, supra note 1, 6 Ind. L.Rev. 741.
[10] See Love, supra note 1, at 91-92; Note, Developments in Contemporary Landlord-Tenant Law; An Annotated Biography, 26 Vand. L.Rev. 689 (1973).
[11] See Lesar, The Landlord-Tenant Relation in Prospective: From Status to Contract and Back in 900 Years?, 9 Kansas L.Rev. 369, 377 (1961); 3A A. Corbin, Contracts § 686, at 236 (rev. ed. 1960); 3 S. Williston, A Treatise on the Law of Contracts § 890, at 580-81 (3d ed. 1962).
[12] See Love, supra note 1, at 92; Donahue, Change in the American Law of Landlord and Tenant, 37 Modern L.Rev. 242, 245-46 (1974).
[13] A sampling of the numerous articles on this subject is as follows: Comment, Implied Warranty of Habitability, 40 Fordham L.Rev. 123 (1971); 1970-71 Annual Survey of American Law, Part 2, Landlord and Tenant, p. 365; Lesar, Landlord and Tenant Reform, 35 N.Y.U.L.Rev. 1279 (1969); Quinn and Phillips, The Law of Landlord-Tenant: A Critical Evaluation of the Past and Guidelines for the Future, 38 Fordham L.Rev. 225 (1969); Schoskinski, Remedies of the Indigent Tenant: Proposal for Change, 54 Geo. L.J. 519 (1966); Grimes, Caveat Lessee, 2 Valparaiso U.L.Rev. 189 (1968); Moskovitz, Rent Withholding and the Implied Warranty of Habitability, 4 Clearing House Rev. 49 (1970); Skillern, Implied Warranties in Leases: The Need for Change, 44 Denver L.J. 387 (1967); Note, Repairing the Duty to Repair, 11 Santa Clara Law. 298 (1971); Love, Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability?, 1975 Wis.L.Rev. 19, 92 (1975) (and authorities cited therein). Note, Landlord-Tenant  The Fall of Landlord Tort Immunity, 35 Ohio St.L.J. 212 (1974).
[14] See Love, supra note 1, at 97 (and cases and authorities cited therein). See also individual cases cited in the text following the Javins rationale, supra.
[15] We also note that the 1972 tentative draft of the Uniform Residential Landlord and Tenant Act, which has recently been debated in Indiana, specifically provides in Section 2.104(A) (2) [entitled "Landlord to Maintain Fit Premises"] that "a landlord shall maintain all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition." (Our emphasis.) All applicable building and housing codes materially affecting health and safety are incorporated into Section 2.104, and the landlord's duty is essentially an "express" warranty of habitability encompassing a covenant to repair. The official comment to this section further explains that its provisions are to parallel the warranty of habitability doctrine now recognized in many jurisdictions.

Section 4.101(B) and (C) also state that the tenant may recover actual damages and obtain injunctive relief for any non-compliance by the landlord in addition to his contractual remedies as set out in Section 4.101 (A).
For an excellent analysis of this Uniform Act, see Note, supra note 1, 6 Ind.L.Rev. 741.
[16] See Guenther v. Jackson (1922), 79 Ind. App. 127, 137 N.E. 582 (Landlord held not liable to tenant for injuries sustained from latent defect unless the landlord agrees to repair and is negligent in so doing. However, the landlord would be liable for all injuries resulting from his failure to inform the tenant of a latent defect known to the landlord of which the tenant is ignorant at the time of the lease.); LaPlante v. LaZear (1903), 31 Ind. App. 433, 68 N.E. 312 (Landlord held liable to tenant for injuries caused by a patent defect  a broken step  in a "common area" upon his promise to repair and subsequent failure to do so.); Stover v. Fechtman (1966), 140 Ind. App. 62, 222 N.E.2d 281 (Landlord held not liable under general rule because steps leading to a double house leased by the landlord were found not to be "a common area."); Coleman v. DeMoss (1969), 144 Ind. App. 408, 246 N.E.2d 483 (Landlord held liable for injuries to tenant sustained in an adjoining field under a duty to maintain in a "reasonably safe condition" those areas over which the landlord has retained control.). See also Parr v. McDade (1974), Ind. App., 314 N.E.2d 768 (Landlords held liable for tenant's injuries in an apartment house fire because they knowingly allowed their employee to occupy an apartment as employee and not as tenant and to use a dangerous open-flame gas heater without warning the tenant occupying the adjacent apartment or taking steps to correct the danger.); Chrysler Corp. v. M. Present Co., Inc., 491 F.2d 320 (7th Cir.1974) (Court reversed entry of summary judgment for warehouse owner holding that, under Indiana law, if property is leased for "public use" the lessor is under affirmative duty to use reasonable care to inspect and repair the premises before transferring possession.); Walker v. Ellis (1955), 126 Ind. App. 353, 129 N.E.2d 65 (Court recognized two exceptions that a landlord may be liable for injuries if he leases premises which are a nuisance, or must in the nature of things become such, or where he leases premises for a public use for which he knows they are unfit and dangerous.); Rimco Realty & Investment Corp. v. LaVigne (1943), 114 Ind. App. 211, 50 N.E.2d 953 (Landlord held liable in action by tenant of a tenement house for loss of personal property resulting from a fire on theory of negligence per se for violation of statutes prohibiting garbage chutes and requiring a watchman in such tenement house.).
[17] For a discussion of the Hadley v. Baxendale rule on damages and its application, see 22 Am.Jur.2d, Damages, §§ 56-62 (1965).
[18] Professor Prosser refers to warranty as a "curious hybrid... of tort and contract". See W. Prosser, Law of Torts § 95, p. 634 (4th ed. 1971); Gregory v. White Truck & Equipment Co., Inc. (1975), Ind. App., 323 N.E.2d 280, 289.
[19] See the individual cases cited in the text following the Javins rationale, supra.
[20] In Chrysler Corporation v. M. Present Company, Inc., 491 F.2d 320 (7th Cir.1974), the Court of Appeals for the Seventh Circuit acknowledged the significance of the Sargent decision. Although not presuming that Indiana courts would adopt the New Hampshire formulation, the court concluded that the trend evidence by Sargent makes "less credible any prediction that exceptions to the rule of landlord nonliability [such as the public use exception herein involved] will be closely confined." 491 F.2d at 325.

California has also acknowledged the Sargent decision in Brennan v. Cockrell Investments, Inc., 35 Cal. App.3d 796, 111 Cal. Rptr. 122 (1973), wherein the court said:
"That a landlord must act toward his tenant as a reasonable person under all of the circumstances, including the likelihood of injury, the probable seriousness of such injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect, seems a sound proposition and one that expresses well the principles of justice and reasonableness upon which the law of torts is based.
* * * * *
"The trend in other jurisdictions is to follow the lead set by California in applying ordinary rules of negligence to tort cases involving owners and occupiers of land. (See Smith v. Arbaugh's Restaurant, Inc., 152 U.S.App.D.C. 86, 469 F.2d 97 (1972); Pickard v. City and County of Honolulu, 51 Haw. 134, 452 P.2d 445 (1969); Mounsey v. Ellard, 363 Mass. 693, 297 N.E.2d 43 (1973); Sargent v. Ross, 113 N.H. 388, 308 A.2d 528 (1973).)"
In Mariorenzi v. Joseph DiPonte, Inc., R.I., 333 A.2d 127 (1975), the Supreme Court of Rhode Island applauded the sentiments expressed in Sargent and extended the reasonable care standard to the common law status of an injured entrant upon the land of another.
[21] Indiana has also long recognized that the breach of a contractual duty may give rise to a tort. See Flint & Walling Mfg. Co. v. Beckett (1906), 167 Ind. 491, 79 N.E. 503; Anderson v. St. Paul Mercury Indemnity Company, 340 F.2d 406 (7th Cir.1965).
[22] See Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971) and other cases cited in text following the Javins rationale, supra.
[23] In ISSUE ONE we have only sought to justify the instruction given by the court at trial. As to the applicability of implied warranty of habitability to the facts of this case, see our discussion in ISSUE THREE, infra.
[24] The Restatement (Second) of Torts § 402 (A) provides:

"§ 402(A). Special Liability of Seller of Product For Physical Harm to User or Consumer.
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.
(2) The rule stated in subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
[25] The language of Instruction 7 as such gives no indication that strict liability in tort of the variety found in Restatement (Second) of Torts § 402(A) is intended rather than contractual liability of the kind found in the Uniform Commercial Code. Both parties treat the Instruction as embodying a § 402(A) standard of strict tort liability ... and the language used does conform to § 402(A) language with some particularity. So for the purposes of this opinion it will be treated in like manner. (It could be theorized that the Instruction is justifiable as a type of strict liability in contract arising from breach of implied warranty of habitability as consequential damages. See ISSUE THREE, infra.)
[26] See ISSUE THREE infra, for a discussion of what constitutes a "breach" of the implied warranty of habitability.
[27] Dwyer is readily distinguishable on its facts. The injury to plaintiff resulted when a worn out bathroom fixture broke loose from the wall causing hot water to gush through the pipes severely burning the tenant.

Dwyer can be interpreted as only standing for the proposition that strict liability in tort is not applicable in a case in which a product (the bath fixture) simply wore out after 15 years of continuous use with no evidence of any defect existing at the time of the original letting of the apartment.
The New Jersey court referred to an "ordinary landlord" in this manner:
"Such a [ordinary] landlord is not engaged in mass production whereby he places his product  the apartment  in a stream of commerce exposing it to a large number of customers. He has not created the product with the defect which is preventable by greater care at the time of manufacture or assembly. He does not have the expertise to know and correct the condition, so as to be saddled with responsibility for a defect regardless of negligence." 301 A.2d at 467.
Dwyer also expressly recognized an exception to the general requirement of proof of negligence to hold a landlord liable for injuries to his tenant based upon his warranty of habitability in cases "where the landlord created the condition [that led to the injuries]." 301 A.2d at 465. See also Coleman v. Steinberg, 54 N.J. 58, 63, 253 A.2d 167 (1969).
[28] The main policy overlaps are reliance, loss spreading, and prevention (or "incentive to safety"). See Chrysler Corp. v. Alumbaugh (1976), Ind. App., 342 N.E.2d 908; Perfection Paint & Color Co. v. Konduris (1970), 147 Ind. App. 106, 258 N.E.2d 681, 685; Cornette v. Searjeant Metal Products, Inc. (1970), 147 Ind. App. 46, 258 N.E.2d 652, 656; Restatement (Second) of Torts § 402(A), Comment c. See also Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69 (1960); Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal. Rptr. 896, 391 P.2d 168 (1964); Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1962); Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965); Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal.2d 453, 150 P.2d 436; Davis v. Gibson Products Co., Tex.Civ.App., 505 S.W.2d 682 (1973); Prosser, Strict Liability to the Consumer in California, 18 Hastings L.J. 9 (1966); Noel, Defective Products: Extension of Liability to Bystanders, 38 Tenn.L.Rev. 1 (1970); 2 Frumer & Friedman, Products Liability, § 16(a)(1), at 3-327 et seq.; Traynor, The Ways & Means of Defective Products and Strict Liability, 32 Tenn.L.Rev. 363 (1965); Love, supra note 1, at 130-160; W. Prosser, Law of Torts §§ 97-98, at 650-51, 656-57 (4th ed. 1971).
[29] Policy considerations also exist which possibly support not imposing strict tort liability on a landlord for breach of his implied warranty of habitability. For a detailed analysis of the question, see Love, supra note 1, at 130-160.
[30] Id.
[31] The court in Theis did rely upon Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314, 326 (1965), which is based heavily upon the principles and policies developing in the products liability area. In Schipper, the unanimous decision of the New Jersey Supreme Court was that a defendant engaged in the business of building and selling houses could be held liable for personal injuries suffered by a vendee as the result of a defect in the house without regard to fault. See 207 A.2d at 325. Cf., Comment to § 402(A); 2 Frumer & Friedman, supra note 28, § 16 (A)(4)(a), at 3-262.5-3-262.6. However, Schipper has not been widely cited or followed in this or other jurisdictions and the overall support used in Theis rests soundly in contract principles and analogies to the UCC warranties of merchantability and fitness for a particular purpose. See Theis, 280 N.E.2d at 304-306.
[32] This problem is forecast in 3 W. Harvey, Indiana Practice Rule 49, at 358 (1970). The author comments at page 363 on the Legislature's abolition of special verdicts and interrogatories and suggests some relief may be gained in complex cases by resorting to TR. 42(C).
[33] The warranty of habitability implied in residential leases is drawn largely from the UCC implied warranties of merchantability and fitness for a particular purpose, as previously discussed in ISSUES ONE and TWO. IC 1971, XX-X-X-XXX, -315 (Burns Code Ed.). As such, it is a creature with ancestry in both contract and tort, but on the contract side of the family, warranty is subject to certain limitations, one of which is privity. See Gregory v. White Truck & Equipment Co., Inc. (1975), Ind. App., 323 N.E.2d 280; Withers v. Sterling Drug, Inc., 319 F. Supp. 878 (D.C.Ind. 1970); W. Prosser, Law of Torts §§ 93, 95 (4th ed. 1971); Love, supra note 1, at 115, n. 533, 145-46 (and authorities cited therein); IC 1971, XX-X-X-XXX (Burns Code Ed.).

One concept underlying the common law development of privity is reliance ... the belief that a contract's vitality stems from the reliance each party places upon the representations (both express and implied) of the other. Such modern concepts as the express and implied warranties in the UCC are based upon this reliance.
The continued viability of privity in Indiana is uncertain following our Supreme Court's recent 3-2 decision in Barnes v. MacBrown and Co., Inc. (1976), Ind., 342 N.E.2d 619 ... both the majority and dissenting opinions adopting a strong stand on the issue. But the vitality of reliance as a "liability determiner" is not. Reliance has continued importance even in such areas as strict liability in tort, where privity is concededly non-existent. In fact, reliance is one of the fundamental policy considerations promoting the expansion of § 402(A) liability. See note 28 supra.
[34] In Indianapolis Newspapers, Inc. v. Fields (1970), 254 Ind. 219, 259 N.E.2d 651, cert. den., 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190, Justice DeBruler states:

"The Court indulges every reasonable presumption in favor of the legality of a jury verdict. State Farm Life Insurance Co. v. Spidel (1964), 246 Ind. 458, 202 N.E.2d 886." 254 Ind. at 257, 259 N.E.2d at 668. (Our emphasis.)
[35] Although the parties wrestled with the "substantial evidence"  "any evidence" dichotomy, the rule is that "a directed verdict is proper only when the evidence is without conflict and is susceptible of but one inference in favor of the moving party." Mamula v. Ford Motor Co. (1971), 150 Ind. App. 179, 275 N.E.2d 849, 852. (other citations omitted).

Our disposition of Old Town's sufficiency claims renders separate consideration of Old Town's motions for a directed verdict on each of Langford's theories unnecessary.
[36] Defects which are not latent, i.e., those arising or developing after the tenant has assumed possession and not present at the lease's inception, are within the second branch of liability under the implied warranty of habitability ... the duty to repair. As such, notice is required by the cases as an indispensible prerequisite to liability. The landlord deserves reasonable notice and a reasonable opportunity to repair the defective condition before a breach of his implied warranty of habitability may occur. See Love, supra note 1, at 104-6; Note, supra note 13, 35 Ohio St.L.J. at 227; and cases cited in the text following the Javins rationale, supra.

The notice requirement can be satisfied in various ways. There may be actual notice as where the landlord is informed of the defect by the tenant or by various public authorities or where he has actual knowledge of the condition. Or, as Professor Love proposes,
"If a lease is a contract containing an implied duty to repair, then it would seem that the courts could also infer the concomitant right to enter for purposes of making periodic inspections." Love, supra note 1, at 105.
From this right to inspect would evolve a constructive notice of any defect capable of discovery by reasonable inspection.
Once notice is received and a reasonable time to repair has elapsed ... both uniquely jury questions ..., a breach may occur. At this point, the tenant may seek judicial relief.
[37] For a more complete list, see Henn, Corporations, p. 203 n. 2 (1961).

Justice Cardozo, when confronted with this mass confusion, lamented in Berkey v. Third Avenue Railway Co., 244 N.Y. 84, 155 N.E. 58 (1926):
"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it.... [T]he picturesqueness of the epithets [must] not lead us to forget that the essential term to be defined is the act of operation." 155 N.E. at 61.
[38] Note, Alternate Methods of Piercing the Corporate Veil in Contract and Tort Cases, 48 B.U.L.Rev. 123 (1968); Note, Limited Limited Liability, 47 Temple L.Q. 321 (1974); Hamilton, The Corporate Entity, 49 Texas L.Rev. 979 (1971)
[39] See Steven v. Roscoe Turner Aeronautical Corporation, 324 F.2d 157 (7th Cir.1963); Allegheny Airlines v. United States, 504 F.2d 104 (7th Cir.1974); note, supra note 38, 48 B.U.L.Rev. at 128-129; Annot., 7 A.L.R. 3d 1343, § 4 (1966); F.J. Powell Parent and Subsidiary Corporations (1931).
[40] Additional factors may consist of inadequate capital structure of the subsidiary, parent's payment of the subsidiary's expenses, and the subsidiary's assets provided solely by the parent.
[41] For an analysis of the approach taken by other courts in this area, including the factors which they found sufficient to apply the instrumentality rule, see Annot., 7 A.L.R.3d 1343, §§ 4, 5, 9, (1966) and 18 Am.Jur.2d 531, § 15-18.
[42] In comparison the California court in Minifie v. Rowley, 187 Cal. 481, 202 P. 673 (1921), also set up a dual standard requiring proof (1) that there is such a unity of interest and ownership that the separate personalities of the individuals and the corporations have ceased to exist; and (2) that an inequitable result will occur if the acts are treated as those of the corporation instead of the individuals. As with the instrumentality rule, these elements may be shown by reference to various combinations of factors determined by the facts in evidence in a given case. See Note, Alternative Methods of Piercing the Corporate Veil in Contract and Tort Cases, 48 B.U.L.Rev. 123 (1968).
[43] Our decision is also supported by the general statement of Indiana law that in cases involving the rights of third persons, the doctrine of "piercing the corporate veil" will be limited "in its application to the prevention of fraud and injustice." (Original emphasis.)

See Feucht v. Real Silk Hosiery Mills, Inc. (1938), 105 Ind. App. 405, 12 N.E.2d 1019; Hart, Schaffner and Marx v. Campbell (1942), 110 Ind. App. 312, 38 N.E.2d 895; Clarke Auto Co. v. Fyffe (1954), 124 Ind. App. 222, 116 N.E.2d 532; Henn, Law of Corporations, § 146, p. 252; Note, supra note 38, 48 B.U.L.Rev. at 126. For additional authorities supporting the alter ego rationale, see Evergreen Plantation, Inc. v. Zunamon, La. App., 291 So.2d 414 (1974); Warriner v. Russo, La. App., 308 So.2d 499 (1975); Kelley, Glover and Vale v. Heitman (1942), 220 Ind. 625, 44 N.E.2d 981 (a holding company held to be identical with, i.e., the alter ego of, its parent corporation); 18 Am.Jur.2d 531, § 15.
[44] Although the permissible scope of the implied warranty of habitability is not at issue here, we point out that several courts have equated adherence to applicable building and housing code standards with the bare requirements for compliance with this warranty. See Steele v. Latimer, 214 Kan. 329, 521 P.2d 304 (1974); Dwyer v. Skyline Apartments, Inc., 123 N.J. Super. 48, 301 A.2d 463; cert. granted and affirmed without opinion, 63 N.J. 577, 311 A.2d 1 (1973); Green v. Superior Court of City and County of San Francisco, 10 Cal.3d 616, 111 Cal. Rptr. 704, 517 P.2d 1168 (1974); Boston Housing Authority v. Hemingway, 363 Mass. 184, 293 N.E.2d 831 (1973); Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970), cert. den. 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185; King v. Moorehead, 495 S.W.2d 65 (Mo. Ct. App. 1973); Jack Spring, Inc. v. Little, 50 Ill.2d 351, 280 N.E.2d 208 (1972); Amanuensis, Ltd. v. Brown, 65 Misc.2d 15, 318 N.Y.S.2d 11 (1971). These courts have often phrased their decisions in terms of "substantial" and "minimus" violations, however, and very little guidance has been offered.

We also note that judicial standards of habitability have tended to be even more imprecise, using such phrases as "habitable and fit for living." Kline v. Burns, 111 N.H. 87, 92, 276 A.2d 248, 252 (1971). See also Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969); Lund v. MacCarther, 51 Haw. 473, 462 P.2d 482 (1969); Marini v. Ireland, 56 N.J. 130, 144, 265 A.2d 526, 534 (1970). In this regard, Justice Fromme in his concurring opinion in Steele v. Latimer, supra, commented as follows:
"In the present opinion the court holds that failure to maintain the premises in compliance with standards set by the Wichita Housing Code constitutes a breach of the implied warranty of habitability. The specific defects noted, such as air leakage, broken countertop in the kitchen and loss of tile in the bathroom, do not indicate how substantial such defects must be to constitute a material breach.
"To constitute a breach of the implied warranty of habitability the lessee should be required to bring the defects to the attention of the lessor and give him a reasonable time to remedy them. (Berzito v. Gambino, 63 N.J. 460, 308 A.2d 17.) The defects should be of such a nature as renders the living quarters unsafe, unsanitary or uninhabitable. . ..
"Not every defect or inconvenience should be deemed to constitute a breach of covenant of habitability; but the condition complained of should be such as truly renders the premises uninhabitable in the eyes of a reasonable person... ." 521 P.2d at 311. (Our emphasis.)
For a list of several factors considered by various courts in determining whether there has been an actionable breach of the implied warranty of habitability, see Steele v. Latimer, supra, (concurring opinion) and Love, supra, note 1, at 102.
[45] New Hampshire categorically refuses to recognize them. See Papakalos v. Shaka, 91 N.H. 265, 18 A.2d 377 (1941). A number of states have specific statutes voiding exculpatory clauses as contrary to public policy. See Annot., 49 A.L.R.3d 321, 347 (1973).
[46] See Annot., supra note 45, 49 A.L.R.3d at 339, et seq.; Love, supra note 1, at 81.
[47] Love, supra note 1, at 85.
[48] We note that the drafters of the Uniform Residential Landlord and Tenant Act (previously discussed in ISSUE ONE, supra note 15) also recognized the practice of including such booby trap clauses in leases. In response Section 1.403, title Prohibited Provisions in Rental Agreements, provides:

"(a) A rental agreement may not provide that the tenant:
(1) agrees to waive or forego rights or remedies under this Act;
* * * * *
(4) agrees to the exculpation or limitation of any liability of the landlord arising under law or to indemnify the landlord for that liability or the costs connected therewith.
"(b) A provision prohibited by subsection (a) included in a rental agreement is unenforceable. If a landlord deliberately uses a rental agreement containing provisions known by him to be prohibited the tenant may recover in addition to his actual damages an amount up to [3] months' periodic rent and reasonable attorney's fees." (Emphasis supplied.)
The Official Comment to Section 1.403 further provides:
"[C]lauses attempting to exculpate the landlord from tort liability for his own wrong have been declared illegal by statutes in some states (compare Mass.G.L. Chapter 186, Sec. 15; New York Real Property Law Section 234; and Ill. Ann. Stat. Chapter 80, Section 15a (Smith-Hurd) (1966). Such provisions, even though unenforceable at law may nevertheless prejudice and injure the rights and interests of the uninformed tenant who may, for example, surrender or waive rights in settlement of an enforceable claim against the landlord for damages arising from the landlord's negligence."
[49] Old Town does not challenge the verdict for $151,500 rendered for Langford as Administrator.
[1] The "dangerous situation" which the jury could have found to be the physical cause of the fire was the proximity of the flue vent to a combustible wooden joist. Primary opinion, p. 768. Whether we attribute this "defect" to "Apartment Design and Construction", "Heating System as a Whole", or "Failure to Inspect", it is still true that the injury-causing defect existed when the apartment left Old Town's hands.
[2] As the quote suggests, Professor Love advocates extension of strict tort liability to all commercial lessors, as well as the builder-lessor, much as § 402A has been extended beyond the manufacturer-seller to encompass all sellers in the distributive chain. However, I need not go that far today since Old Town is both the builder and the commercial lessor, and I do not comment upon the propriety of such an extension of strict liability.
[3] It is noteworthy that one of the cases relied upon in Perfection Paint was Price v. Shell Oil Co., supra, in which strict liability was imposed upon a commercial lessor of personal property.
[4] Regardless of the means by which the product is "injected into the stream of commerce ..." Link v. Sun Oil Co., supra, 312 N.E.2d at 130, the party doing so is not subject to liability under § 402A unless he "is engaged in the business of selling such a product... ." § 402A(1)(a). Dwyer v. Skyline Apartments, Inc., supra, is distinguishable because there the defendant was deemed to be an "ordinary landlord", ante, p. 766 n. 25, obviously the counterpart of an "occasional seller" exempt from the coverage of § 402A. See Comment f. to § 402A.
[5] I recognize that Langford's Instruction 6 paraphrases the Uniform Commercial Code's Implied Warranty of Fitness for a Particular Purpose, Ind. Ann. Stat. XX-X-X-XXX (Burns Code Ed. 1974), and that Instruction 7 paraphrases § 402A of 2 Restatement of Torts 2d. I further recognize that there exist differences in form between these two rules, most notably with respect to privity and post-injury notice, see Love, Landlord's Liability for Defective Premises, supra, at 145-153; 2 Frumer & Friedman, supra, § 16A[4][a] pp. 3-262.5 et seq., which might persuade a given court to accept one rule yet reject the other while still retaining "strict liability" (whether in "tort" or "contract") to achieve the same general goals of public policy which underlie both rules. However, it is obvious here that such distinctions are not the reasons behind the court's simultaneous approval of Instruction 6 and rejection of Instruction 7. What lies at the heart of the court's distinction between the two instructions is the basis of my disagreement with the court's reasoning in Issues One through Three  the court's conception of the "warranty" embodied in Instruction 6 as an obligation "breachable" only by negligent conduct.
[6] I recognize that the precise legal definition of a "defect" under a § 402A instruction such as #7 may differ slightly from the definition of such found in UCC-type "implied warranty" as is embodied in Instruction 6. See Love, Landlord's Liability for Defective Premises, supra, at 146-150. But since I am convinced that the jury could have found the "dangerous situation" created by the flue vent's proximity to the wooden joist to be a "defect" under either definition, I leave for another day exploration of such differences in terms.